**MISSISSIPPI PROTECTION &
ADVOCACY SYSTEM, INC.,
et al., Plaintiffs–Appellees,**

**v.**

**Paul COTTEN, Individually and in His
Official Capacity, Etc., et al.,
Defendants–Appellants.**

No. 89–4806.

United States Court of Appeals,
Fifth Circuit.

April 29, 1991.

Rehearing Denied June 6, 1991.

Rhine, Protection & Advocacy Inc., Glendale, Cal., Daniel Pone, Protection & Advocacy Inc., Oakland, Cal., Ronald K. Lospennato, Disabilities Rights Ctr, Concord, N.H., for amicus curiae-Nat. Asso.

Before BROWN, POLITZ, and JOHNSON, Circuit Judges.

POLITZ, Circuit Judge:

Paul Cotten, the Director of the state mental retardation center in Boswell, Mississippi, and the other defendants (hereafter collectively "Center") appeal an adverse summary judgment and mandatory injunction entered against them in their official capacities as representatives of the State of Mississippi. Finding no error, we affirm.

### Background

The Boswell Retardation Center is a state-owned and operated facility for approximately 250 adult residents who suffer from mild to profound mental retardation. Mississippi participates in a program established by Congress in the Developmental Disabilities Act, 42 U.S.C. §§ 6000 *et seq.* (Supp.1989). In exchange for federal funding each state participating in the program must create a protection and advocacy system empowered to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for" persons within the programs, and to "provide information on and referral to programs" addressing their needs, and to "investigate incidents of abuse and neglect of [such persons] if the incidents are reported to the [P & A system] or if there is probable cause to believe that the incidents occurred." 42 U.S.C. § 6042(a)(2).[1] The Mississippi Protection

T. Hunt Cole, Belinda J. Stevens, Asst. Attys. Gen., Mike Moore, Atty. Gen., Jackson, Miss., for defendants-appellants.

Shirley Payne, Horne & Payne, Jackson, Miss., Catherine Blakemore, Joseph C.

---

1. 42 U.S.C. § 6042 provides in pertinent part:
 (a) In order for a State to receive an allotment under subchapter II of this chapter—
 (1) the State must have in effect a system to protect and advocate the rights of persons with developmental disabilities;
 (2) such system must—

(A) have authority to—
(i) pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such persons within the State who are or who may be eligible for treatment, services, or habilitation, or who are being considered

and Advocacy System (MP & A) is the federally-mandated and funded state entity created pursuant to the Act.

Invoking 42 U.S.C. § 1983, MP & A sought declaratory and injunctive relief after the Center made massive changes in the visitation policies applicable to its attorneys. These changes followed upon the heels of an investigation by MP & A of the treatment accorded Robert Clanton, a patient at the Center who was locked down in a solitary confinement cell for five days with neither a mattress nor toilet facilities. The Clanton situation caused significant unfavorable publicity leading to an admission by the Mississippi Department of Mental Health that "time-out" policies had not been adhered to in the Clanton incident.[2]

Shortly after the Clanton investigation MP & A received an anonymous tip and began a probe into the death of Charlie Jones, a Center patient who died after being subjected to a disciplinary restraining hold. The media widely publicized this incident. At that time the Center began to change the rules regarding MP & A visitation, initially requiring MP & A to demonstrate relevance for any record requested. By July 24, 1987, the Center was limiting access to the facility and the residents.

For purposes of this appeal we need only recount the more egregious aspects of the rule revisions. The Center first required that residents could not be interviewed by MP & A on the same visit as its initial review of records. The stated purpose was to permit Center officials to obtain the name of the patient involved in the complaint being investigated.

Then the Center imposed new notice and pre- and post-screening requirements for patient interviews and visits. Whereas MP & A representatives were permitted to visit at any reasonable time with a patient with whom they had an established attorney-client relationship (established, we would add, by a written retainer agreement), barriers were erected between MP & A and all other patients. To interview a resident, MP & A had to notify the legal department of the State Department of Mental Health at least 24 hours in advance of the planned visit. If the patient had a guardian the guardian would be contacted to grant or deny permission. For patients without guardians, Center personnel would ask the patient if he desired such a meeting and, if he did, the patient would be asked whether he wanted a Center staff member present. Before a visit would be authorized, MP & A had to explain its reason for the interview and provide proof of probable cause to believe a legal problem existed. An attorney for the State of Mississippi advised MP & A that its "staff will not be permitted to visit with residents with whom there is no attorney-client relationship unless an appointment has been made by the Legal Unit of the Department of Mental Health." Fol-

for change in living arrangements, with particular attention to members of minority groups; and

(ii) provide information on and referral to programs and services addressing the needs of persons with developmental disabilities;

(B) have the authority to investigate incidents of abuse and neglect of persons with developmental disabilities if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred;

(C) on an annual basis, provide the public with an opportunity to comment on priorities established by, and activities of, the system;

(D) establish a grievance procedure for clients or prospective clients of the system to assure that persons with developmental disabilities have full access to services of the system; ...

(G) have access to all records of—

(i) any person with developmental disabilities who is a client of the system if such person, or the legal guardian, conservator, or other legal representative of such person, has authorized the system to have such access; and

(ii) any person with developmental disabilities—

(I) who, by reason of the mental or physical condition of such person, is unable to authorize the system to have such access;

(II) who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and

(III) with respect to whom a complaint has been received by the system or with respect to whom there is probable cause to believe that such person has been subject to abuse or neglect;

2. These policies proscribe solitary confinement for periods in excess of one hour.

lowing any authorized visit, the resident was "debriefed" or "counseled" by a staff member.

MP & A faced multiple practical limitations to establishing a formal attorney-client relationship with Center residents. Many knew each other only by first or nicknames; thus identification in advance became extremely difficult. The mental limitations suffered by most of the patients, their very reason for being in the Center, militated against their understanding of the concept of an attorney-client relationship. Many could not read or write yet the Center's policy, as above noted, required a retainer agreement in writing. The barriers were raised even higher when the Center prevented MP & A from making known to the patients its existence and statutory charge. The Center prohibited the MP & A from meaningfully informing the Center's residents, the very group of persons it was federally-mandated to protect, of its presence and purpose.

Even if these barriers could be scaled, the pre-screening and post-interview counseling could only create a chilling effect of gigantic proportions. The Center's ability to cower and intimidate many if not most of its mentally deficient patients is potent and pervasive.

This action was brought initially by MP & A and Daniel Lemon, a resident of the Center, through "next friend" Thomas W. Talkington, as a putative class action. Lemon was released from the Center; Glen Allen Porter was substituted for him. Porter was released from the Center. MP & A moved to amend the complaint to substitute Eugene Shields, another resident of the Center. The trial court allowed the amendment, granted plaintiffs' motion to certify a Fed.R.Civ.P. 23(b)(2) class of all present and future developmentally disabled residents of the Center, and granted plaintiffs summary judgment and injunctive relief. The court found that the Center's policies interfered with the plaintiffs' rights to an effective protection and advocacy system as required by the Act. The court then called upon the parties to attempt to fashion a mutually acceptable plan to comply with the Act. No such plan was forthcoming. Counsel for Mississippi made clear, orally and in writing, that it would not participate in such an effort, a posture it petulantly maintained to and through oral argument before this court.

Faced with defendant's refusal to assist in the fashioning of a plan to resolve this matter the court prepared a remedy in the form of a permanent injunction which: (1) permitted MP & A access to the Center's residents with time and place restrictions tailored to minimize interference with the Center's programs; (2) relieved MP & A of the requirement of having a written retainer before interviewing a resident; (3) required the Center to provide a private meeting room for MP & A's use in advising patients of their rights; and (4) required the Center to inform the guardians of new admittees about MP & A's services. Simultaneously, MP & A was directed not to interfere with program scheduling at the Center and to honor a patient's request to terminate any meeting. The defendants timely appealed.

## Analysis

■ Appellants first contend that Eugene Shields lacks standing to prosecute this appeal, noting that the issue at bar is access to legal representation, and because Shields has been able to retain counsel, the matter is now moot as to him. This argument is as ingenuous as it is unpersuasive. Taking defendant's theory to its logical conclusion, no patient—if represented by counsel—could ever have standing to litigate this matter in a federal forum. Further, as a result of the developmental disability which requires their treatment, no patient of the Center is likely to be capable of representing himself in this or any court. Thus, appellants maintain that under no conceivable set of circumstances is this matter justiciable in a federal courtroom. Such a contention is an anathema to our judicial system and ignores the relation back doctrine of class certification. *Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030 (5th Cir.1981). Under certain circumstances some transitory claims are viewed as "capable of repetition, yet evading re-

view," *Sosna v. Iowa*, 419 U.S. 393, 399–400, 95 S.Ct. 553, 557, 42 L.Ed.2d 532, 540 (1975), and therefore certifiable as class actions if the named plaintiff presents a live controversy when filing his complaint and at the time of the certification of the class. We recognized one of those special circumstances in *Zeidman*, a securities action in which the defendant tendered to each named plaintiff a full settlement of his claim, thereby rendering "moot by *purposive action of the defendants*," each individual's claim. *Zeidman*, 651 F.2d at 1049 (emphasis original). We do not address whether the discharge of patients Lemon and Porter was similarly motivated, for that is a matter we need not now reach.[3] Either because Shields' controversy with the Center encompasses more than just his inability to secure counsel,[4] or because the issue would otherwise evade judicial review, there is no error in the district court's certification of Shields as class representative. We perceive no reason to assume that anything less than "vigorous advocacy can be expected to continue." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 398, 100 S.Ct. 1202, 1210, 63 L.Ed.2d 479, 492 (1980).

■ The Center also contends that the trial court erred by permitting the substitution of Porter with Shields, pursuant to Fed.R.Civ.P. 15. The trial court's finding "that defendants would not be prejudiced by this amendment, as it in no way changes the nature of the lawsuit," was neither factually erroneous nor legally incorrect. It was within the court's discretion with respect to Rule 15 rulings. *Nance v. Gulf Oil Corp.*, 817 F.2d 1176 (5th Cir.1987).

---

**3.** We also need not reach the issue of whether MP & A itself had standing to pursue the rights of the individuals it is chartered to protect. *See Developmental Disabilities Advocacy Center, Inc. v. Melton*, 689 F.2d 281 (1st Cir.1982).

**4.** For example, MP & A also serves an important investigatory function in its advocacy role. 42 U.S.C. § 6042(a)(2)(B). Further imposition of undue limitations on its access to the Center present an immediate and realistic threat, *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), of genuine harm to Shields and all patients at the Boswell Center.

## *The Merits of the Summary Judgment*

Appellants maintain that the trial court erred by granting summary judgment to the appellees. In reviewing a summary judgment we apply the same standard as the trial court, viewing the facts in the light most favorable to the nonmoving party. *Waltman v. International Paper Co.*, 875 F.2d 468 (5th Cir.1989). Where the record, including affidavits, interrogatories, admissions, and depositions could not, as a whole, lead a rational trier of fact to find for the nonmoving party, there is no issue for trial. *Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121 (5th Cir. 1989).

■ Appellants first argue that the district court erroneously grafted onto the litany of 42 U.S.C. § 6042 an additional requirement that the state's entity serve as an "effective" advocacy system.[5] While Mississippi obviously would prefer that the congressionally-required system be simply *pro forma*, that was not Congress's stated intent. Indeed the statute does not merely require that the state have an advocacy system, but specifically declares:

> In order for a State to receive an allotment under subchapter II of this chapter—
>
> (1) the State must have *in effect* a system to protect and advocate the rights of persons with developmental disabilities;

42 U.S.C. § 6042(a) (emphasis supplied). The district court properly used the adjectival form of "effect" to describe the barebones minimum required of the State of Mississippi in consideration of its annual receipt of significant amounts of federal dollars. Requiring an "effective" system

---

**5.** The Center specifically adverts our attention to this language in the trial court's memorandum opinion which it finds offensive:

> First, section 6042 gives to the institutionalized developmentally disabled the right to an effective protection and advocacy system. When Boswell policies are examined in the context of this requirement, and in light of the limitations of the mentally retarded, it is clear that Boswell officials are interfering with the plaintiff residents' rights to an effective system.

of advocacy is poles apart from the judicial rewriting of legislation in *Board of Education v. Rowley,* 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), upon which the state rests its argument. In *Rowley,* the district court had taken a requirement that each handicapped student receive "free appropriate public education," and defined such as "an opportunity to achieve [her] full potential commensurate with the opportunity provided to other children." *Id.* at 185–86, 102 S.Ct. at 3040, 73 L.Ed.2d at 699. The legislative history led to the conclusion that the "appropriate" quality was satisfied by "providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Id.* at 203, 102 S.Ct. at 3049, 73 L.Ed.2d at 710. In the case at bar, by requiring an effective system the trial court did not create a substantive standard beyond the plain text of the statute.

 Mississippi argues that its system is as effective as it should be under 42 U.S.C. § 6042, that it need do no more. This argument recalls to mind arguments presented to this court decades ago by other representatives of the State of Mississippi.[6] The argument is equally unpersuasive today. The district court stated:

> Defendants' view of the scope of MP & A's statutory function as simply that of attorneys available to be retained by residents if they or their guardians so desire simply does not square with the broad range of services contemplated by the [Developmental Disabilities] Act, services that include education and referral in addition to strictly legal representation. The Act not only described the range of services to be provided by the protection and advocacy systems, it also states that the systems "must have the authority" to perform these services. The state

cannot satisfy the requirements of the DDA by establishing a protection and advocacy system which has this authority in theory, but then taking action which prevents the system from exercising that authority. Defendants' restrictive practices have reduced MP & A's authority to the point that it can offer Boswell residents only a fraction of the services to which they are entitled.

We are in full accord. The mandatory provisions of section 6042 relating to authority to investigate incidents of abuse and neglect are rendered nugatory by the Center's restrictions on MP & A. § 6042(a)(2)(B). Similarly, MP & A is prevented from performing its statutory duty of establishing a grievance procedure for clients or prospective clients. § 6042(a)(2)(D). The regulations are such that MP & A has virtually no access to clients not retained prior to the change in the regulations. Most importantly, the Center's regulations render the state's requirement to "have in effect a system to protect and advocate the rights of persons with developmental disabilities" comatose if not moribund. § 6042(a)(2). The trial court did not err in finding a violation of the Act.[7]

Finally, appellants argue that the injunction is overly broad. Our review of the record, the trial court's careful and scholarly memorandum opinion, and the controlling law persuades us beyond peradventure that the injunction is appropriate.

The judgment of the district court is, in all respects, AFFIRMED, and the matter is returned to the district court for its continuing supervision of the injunction.

---

**6.** *Cf. Meredith v. Fair,* 298 F.2d 696, 701 (5th Cir.1962) (Wisdom, J.) ("This case was tried below and argued here in the eerie atmosphere of never-never land. Counsel for appellees argue that there is no state policy of maintaining segregated institutions of higher learning and that the court can take *no judicial notice of this plain fact known to everyone.*").

**7.** We find no merit in the Center's contention that the trial court improperly made a credibility finding by failing to consider the affidavit of its director and counsel to the effect that they worked in good faith to cooperate with the system. Pretermitting a decision on candor, we perceive no relevance to this assertion in light of regulations that on their face violate the letter and spirit of the Act.