MICHIGAN PROTECTION &
ADVOCACY SERVICE,
INC., Plaintiff,

v.

Gerald H. MILLER, in his capacity as
Director, Michigan Department of
Social Services, Defendant.

No. 5:92–CV–146.

United States District Court,
W.D. Michigan, S.D.

March 24, 1994.

Annette E. Skinner, Michigan Protection & Advocacy Service, Lansing, MI, for plaintiff.

Janis Meija, William R. Morris, Frank J. Kelley, Atty. Gen., Lansing, MI, for defendant.

## MEMORANDUM OPINION

McKEAGUE, District Judge.

Plaintiff Michigan Protection & Advocacy Service, Inc. ("MPAS"), initiated this action against defendant Gerald H. Miller on December 11, 1992. Defendant Miller is the Director of the Michigan Department of Social Services ("DSS") and is sued in his official capacity. DSS operates training schools, regional detention facilities, and foster care homes for minors, which offer a variety of educational and rehabilitative programs. In its complaint, MPAS seeks a declaratory judgment that defendant has violated federal law and that defendant is required to abide by the relevant provisions of the federal statutes implicated in this case. The parties are now before the Court on MPAS' motion for summary judgment (# 18).

## FACTS

The state of Michigan participates in federal programs pursuant to two federal acts, the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. § 6000 *et seq.*, and the Protection and Advocacy for Mentally Ill Individuals Act ("PA-MII Act"), 42 U.S.C. § 10801 *et seq.* To receive federal funding under these statutes, Michigan must create a protection and advocacy system to protect and advocate the rights of persons who suffer developmental disabilities and mental illness. 42 U.S.C. §§ 6042(a)(1), 10803. The protection and advocacy agency must have the authority to pursue legal, administrative, and other appropriate remedies to ensure that the rights of these vulnerable populations are not violated. 42 U.S.C. §§ 6042(a)(2)(A), 10805(a)(1).

MPAS provides advocacy services to individuals with developmental disabilities, emotional impairments, and mental illness in the state of Michigan pursuant to these statutes. The organization derives it authority from a letter issued by Governor John Engler on May 9, 1991, to officials in the federal government, which designates MPAS as the protection and advocacy agency for persons who suffer developmental disabilities and mental illness in Michigan. MPAS filed the present action against defendant Miller because it believes that DSS is not providing MPAS with reasonable access to facilities which house individuals with these conditions, in violation of the federal acts. Presently, MPAS enjoys only limited access: it may speak with a minor in a DSS facility if the minor is a MPAS client or if there has been a complaint to MPAS regarding the minor. DSS justifies these limitations on the grounds that such restrictions are necessary to protect outsiders' safety, avoid disruption of educational and rehabilitation programs, and protect the privacy of minors.

MPAS contends that greater access is mandated by law, as many individuals with developmental disabilities and/or mental illness reside in DSS facilities. The advocacy organization points to several reports issued in conjunction with studies at DSS facilities to support the assertion that DSS facilities house minors who suffer from such conditions. The first, a 1982 report prepared by a team of psychologists and psychiatrists from the University of Michigan who evaluated a group of minors in two DSS facilities, concluded that 68% of the youth evaluated had psychiatric disorders, while another 4% were mentally retarded. A 1988 report further observed that specialized mental health services were greatly needed in two DSS training schools. Mental health professionals at one DSS facility issued a document in June of 1989 which indicated that "one-third of the training school youth can benefit from mental health assessment."

More recently, a 1993 letter from the Director of the DSS Office of Delinquency Services stated that many DSS residents have profound psychiatric and behavioral problems. A June 1993 report addressing safety concerns confirms this director's analysis. That report expressly noted that certain DSS facilities target populations who suffer emotional impairments or developmental disabilities. A list of medication prescribed to residents at one training school indicates that

many young people continue to suffer developmental disabilities and/or mental illness.

Based on these reports, MPAS has moved for summary judgment against DSS. Although plaintiff's brief requests a "permanent injunction requiring defendant Miller to allow MPAS reasonable access to DSS facilities, eligible clients, and records," the original complaint requests only a declaratory judgment that defendant is in violation of the DD and PAMII Acts and that defendant must abide by the provisions of such statutes. The Court has reviewed the motion, defendant's response, the arguments at the hearing, and the supplemental briefs filed in this matter, and now determines that the motion is ready for disposition.

## DISCUSSION

Plaintiff MPAS seeks summary judgment on the basis that although DSS facilities house individuals with developmental disabilities and mental illness, MPAS is being denied reasonable access to such individuals to provide protection and advocacy services. Defendant maintains that plaintiff is not entitled to greater access than it presently enjoys. The defendant premises this argument on three grounds. First, DSS questions MPAS' authority as the designated advocacy organization in the state of Michigan. Second, DSS objects to the parameters of reasonable access to which MPAS claims entitlement. According to DSS, the level of access sought by MPAS is not required by the federal statutes, would constitute substantial interference with DSS programs, would infringe upon the privacy rights of DSS residents, and would risk the safety of involved individuals. Finally, DSS contends that greater access by MPAS would constitute interference with the state juvenile courts' continuing jurisdiction. Accordingly, defendant argues that there is no basis for summary judgment in favor of the plaintiff.

■ Summary judgment is appropriate when the record reveals that there are no issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Sims v. Memphis Processors, Inc.*, 926 F.2d 524, 526 (6th Cir.1991) (citing *Celotex Corp. v. Catrett*,

477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986), and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir.1989) (quoting *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2510 (emphasis in original).

■ The moving party bears the burden of clearly and convincingly demonstrating the absence of any genuine issues of material facts. *Sims*, 926 F.2d at 526. The court must consider all pleadings, depositions, affidavits, and admissions on file and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the moving party carries this burden, the nonmoving party must present significant probative evidence showing that genuine, material factual disputes remain to defeat summary judgment. *Sims*, 926 F.2d at 526. The court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Id.* The court must make purely legal judgments that go to the nature and sufficiency of the complaint as well as the evidence put forward to support it. *Val–Land Farms, Inc. v. Third Nat'l Bank*, 937 F.2d 1110, 1113 (6th Cir.1991). Applying these principles to the present case, the Court concludes that plaintiff's motion for summary judgment shall be granted.

## I. MPAS' Authority as Designated Advocacy Organization

■ Defendant first maintains that MPAS does not have authority to protect and advo-

cate the rights of minors housed in DSS schools and centers. MPAS contends that it has authority under the DD and PAMII Acts to enter DSS facilities and provide services to facility residents. Under these acts, state protection and advocacy systems are authorized to pursue various legal and administrative remedies to ensure that the rights of persons with developmental disabilities and mental illnesses are protected. 42 U.S.C. §§ 6042(a)(2)(A), 10805(a)(1). MPAS claims that Governor Engler has designated it as the advocacy service within the state of Michigan, thus giving MPAS the right to protect DSS residents who suffer developmental or mental disabilities.

MPAS' claim that Governor Engler has designated the organization as the appropriate advocacy service rests on the Governor's letter of May 9, 1991, to the federal government. In that letter, Governor Engler assures federal officials that the protection and advocacy system in Michigan has authority "to pursue legal, administrative, and other appropriate remedies to ensure the protection of the rights of all persons in Michigan" who suffer developmental disabilities and mental illness.

DSS argues that the Governor's letter does not extend MPAS' authority into DSS facilities. Because the Governor's letter directs only the Michigan Department of Mental Health ("DMH"), and not DSS, to explore further options for the protection and advocacy of the rights of the developmentally and mentally disabled, DSS claims the letter does not give MPAS the right to access DSS facilities. Omission of any mention of DSS strongly suggests that MPAS' role in the state of Michigan is confined to facilities operated by DMH, DSS contends.

DSS' objection is not supported by the language or spirit of the Governor's letter. The letter is replete with references to the broad authority of MPAS to protect the rights of *all* persons in Michigan who suffer developmental disabilities or mental illness, not just those who reside in DMH facilities. At no point does the Governor suggest that MPAS' authority is in any way limited to actions taken by the DMH. DSS' objection lacks merit. MPAS clearly has legal authori-ty to protect and advocate the rights of all individuals in state facilities who suffer developmental disabilities or mental illness.

## II. Parameters of "Reasonable Access"

Defendant next contends that the level of access sought by MPAS is not required by the federal statutes, and would interfere with DSS' ability to safely and effectively operate its educational and rehabilitation programs. Analysis of this argument first requires a thorough examination of the DD and PAMII Acts. The Court then examines these federal statutes in conjunction with the practical factors affecting access to DSS facilities.

### A. Access Under the Federal Acts

The language of the DD and PAMII Acts is not identical. Under the DD Act, a person with a developmental disability is defined in part as one who suffers a "severe, chronic disability ... [which] is attributable to a mental or physical impairment or combination of mental and physical impairments." 42 U.S.C. § 6001(5). An express purpose of the Act is "to make grants to support a system in each State to protect the legal and human rights of persons with developmental disabilities." 42 U.S.C. § 6000(b)(8). States are entitled to such grants upon establishment of a system to protect and advocate the rights of individuals who are developmentally disabled. Such a system must have the authority to:

> pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such persons within the State who are or who may be eligible for treatment, services, or habilitation....

42 U.S.C. § 6042(a)(2)(A)(i); *Mississippi Protection & Advocacy System v. Cotten,* 929 F.2d 1054, 1055 (5th Cir.1991). The authority to investigate abuse is also granted by the Act, if the abuse is reported or there is probable cause to believe it occurred. 42 U.S.C. § 6042(a)(2)(B); *Cotten,* 929 F.2d at 1055. Furthermore, the protection and advocacy service must have the power to access the records of all individuals with developmental disabilities who are clients of the service or are the subject of a complaint to

the service. The service must also have the authority to access records if there is probable cause to believe an individual has been subject to abuse or neglect. *See* 42 U.S.C. § 6042(a)(2)(G).

The PAMII Act applies to individuals who suffer a mental illness. The Act defines an "individual with mental illness" as a person who "has a significant mental illness or emotional impairment, as determined by a mental health professional ... and ... is an inpatient or resident in a facility rendering care or treatment." 42 U.S.C. § 10802(4). Like the DD Act, PAMII also requires that states establish a protection and advocacy system which has the authority to investigate incidents of abuse and neglect and to pursue administrative, legal, and other remedies to ensure the protection of individuals with mental illness. 42 U.S.C. § 10805(a)(1); *Robbins v. Budke*, 739 F.Supp. 1479, 1481 (D.N.M.1990). States must also confer upon the system the power to access records under the same circumstances as those listed in the DD Act. 42 U.S.C. § 10805(a)(4). PAMII goes one step further, however, and requires that the protection and advocacy organization have the authority to access facilities in the state which provide care and treatment to mentally ill individuals. 42 U.S.C. § 10805(a)(3); *Robbins*, 739 F.Supp. at 1481.

Citing this distinction between the two federal acts, defendant maintains that plaintiff MPAS has authority to access only those facilities which provide care and treatment to persons who suffer mental illness and thus fall under PAMII. Defendant contends that MPAS does *not* have the right to access DSS facilities, because: (1) DSS facilities do not qualify as "PAMII facilities," and (2) plaintiff has failed to establish that DSS facilities house mentally ill persons as defined in PAMII, as opposed to those who are developmentally disabled.

■ Defendant first argues that even if DSS training schools and detention centers did house mentally ill individuals, such facilities would not fall under the PAMII Act. According to defendant, PAMII applies only to those facilities whose main purpose is the care and treatment of mentally ill individuals.

DSS contends that because its facilities focus on education and rehabilitation of residents, they do not qualify as "facilities" for purposes of the PAMII Act. This argument is without merit. The Act itself specifies that:

> The term "facilities" may include, but need not be limited to, hospitals, nursing care homes, community facilities for individuals with mental illness, board and care homes, homeless shelters, and jails and prisons.

42 U.S.C. § 10802(3). Clearly, the main purpose of a homeless shelter or a jail is not the treatment of mental illness. The simple fact that DSS facilities are primarily concerned with education and rehabilitation does not prevent them from falling under the auspices of PAMII. Accordingly, DSS facilities are governed by PAMII if they house mentally ill individuals.

■ Defendant's second argument with respect to coverage under PAMII also lacks force. In response to significant evidence from plaintiff indicating that DSS facilities do in fact house mentally ill persons, defendant maintains that because the youth in the system have not recently been determined to be mentally ill or emotionally impaired by a mental health professional, they do not fall within the ambit of PAMII. The Court notes that MPAS has offered substantial evidence indicating that many DSS facilities have in the past housed minors who suffer mental illness, as determined by mental health professionals. Recent evidence proffered by MPAS also suggests that some current DSS residents may be mentally ill. DSS's present policy of denying MPAS full access prevents the advocacy organization from bringing in their own mental health professionals to ascertain whether any DSS residents do in fact suffer from mental illness. Such conduct by DSS defeats the very purpose of PAMII and the DD Act to provide effective protection and advocacy services to mentally ill and developmentally disabled individuals.

Finally, the Court notes that even if DSS facilities did not house mentally ill persons, and thus were not governed by PAMII, greater access would still be required under the DD Act. Although the DD Act does not explicitly require access to facilities which house covered individuals as does PAMII,

the Act has been read to require more than mere access to records. In *Cotten,* 929 F.2d at 1054, the Fifth Circuit upheld a lower court injunction under the DD Act which granted the protection and advocacy service access to *all* of defendant's residents, with time and place restrictions tailored to minimize interference with the defendant's programs; relieved the service of the requirement of a written retainer from a resident before it could interview that resident; required defendant to provide the service with a private room to meet with residents; and required defendant to inform new residents about the services offered by the protection and advocacy service. *Id.* at 1057. This injunction thus contemplated a right by the protection and advocacy service to access the defendant's facilities. The Fifth Circuit expressly noted that further limitations on access would render "the state's requirement to 'have in effect a system to protect and advocate the rights of persons with developmental disabilities,' comatose if not moribund." *Id.* at 1059 (citing 42 U.S.C. § 6042(a)(2)).

Accordingly, the Court finds that the DD and PAMII Acts together give MPAS authority to access DSS facilities and records. Such access goes beyond the level presently available to the plaintiff organization. Defendant's statutory objections to plaintiff's motion for summary judgment are without merit.

**B. Practical Concerns Affecting Access**

■ DSS next maintains that granting MPAS greater access to DSS facilities than it currently enjoys would substantially interfere with the department's educational and rehabilitation programs, would infringe upon the privacy rights of DSS residents, and would risk the safety of all involved. In light of these concerns, defendant contends, additional access is not reasonable. MPAS access is the same as that presently enjoyed by the attorneys of DSS residents and other visitors.

Although defendant's practical concerns are important and must be considered in shaping the parameters of access to DSS facilities, ultimately they do not defeat plaintiff's motion for summary judgment. First,

defendant has failed to indicate how the access MPAS seeks would "substantially interfere" with DSS programs. MPAS does not seek unrestricted, 24–hour access as DSS alleges, but rather has indicated it is willing to schedule interviews with DSS residents so as minimize interference with the educational and rehabilitative programs offered. This level of access was expressly approved in *Cotten. Cotten,* 929 F.2d at 1057 (upholding injunction that permitted the advocacy service access to defendant center pursuant to "time and place restrictions tailored to minimize interference with the Center's programs").

Second, DSS has failed to indicate how permitting MPAS greater access to DSS facilities would violate the privacy rights of the youth who reside there. In its brief in opposition to plaintiff's motion for summary judgment, DSS suggests that opening facility doors to MPAS would violate the department's obligation under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1232g(b), to permit the release of records only when authorized by the parents. Section 1232g(b) does prohibit federal funding to educational institutions which permit the release of records without parental consent. The DD and PAMII Acts, however, clearly mandate that organizations like MPAS have the authority to access DSS facilities and records in specific cases where developmentally disabled and mentally ill individuals are involved. Defendant's reliance on the IDEA is misplaced.

Furthermore, MPAS itself has a statutory duty under PAMII to maintain the confidentiality of any records to the same extent as DSS. *See* 42 U.S.C. § 10805(a). In light of this obligation, DSS' concerns about resident privacy are misplaced.

Finally, DSS has not indicated how greater access by MPAS staff members will threaten the safety of visitors to DSS facilities. Clearly, some restrictions are warranted to ensure the safety of all involved. However, DSS has failed to demonstrate why present limitations on access are the only available methods to ensure the safety of MPAS visitors. Surely, other options are available which will allow MPAS to fulfill its statutory

duty under the DD and PAMII Acts while ensuring the protection of visitors.

Accordingly, the Court finds that DSS' practical objections to plaintiff's motion for summary judgment are without merit. Although such concerns must be considered when fashioning the parameters of MPAS access to DSS facilities, they do not require that the Court deny the motion.

### III. Jurisdiction of State Juvenile Courts

The last ground for DSS' opposition to the plaintiff's motion for summary judgment relates to the role of state juvenile courts in the placement of minors in DSS facilities. Such minors remain within the jurisdiction of juvenile court in cases where the offense, "if committed by an adult, would be punishable by imprisonment for more than 1 year or [where the offense is] expressly designated by law to be a felony." M.C.L.A. § 712A.18c(1). The juvenile court must conduct an annual review of the services available to the minor child, the minor's placement, and the minor's progress in that placement. M.C.L.A. § 712A.18c(3). The court has the authority to order changes in the minor's treatment or placement based on the review. *Id.* Furthermore, parental rights are not typically terminated in cases of juvenile delinquency.

 Citing this special role of the juvenile courts, defendant makes essentially three arguments. First, DSS maintains that the juvenile court, in conjunction with the parents and DSS, is charged with the determination of whether a minor child within its jurisdiction is in need of mental health treatment. The court's decision to place a minor in a DSS, as opposed to a DMH, facility, defendant argues, constitutes an adjudication on the mental health of that individual. Accordingly, defendant contends, DSS facilities differ. from those identified in the DD and PAMII Acts, and there is no need for monitoring by MPAS. Defendant's argument is without merit. The Court has already noted that DSS facilities fall within the ambit of the DD and PAMII Acts; MPAS must thus have the power to access those facilities. The juvenile court's continuing role in supervising the placement of minors is not affected by MPAS access, nor does it limit the boundaries of such access under the federal statutes.

Second, defendant DSS contends that as the adjudication of a court, the juvenile court's decision to place a delinquent minor in a DSS facility, as opposed to a mental health center, should be given *res judicata* effect. MPAS' attempt to gain greater access to DSS facilities, defendant maintains, constitutes an attack on the juvenile court and DSS' placement and treatment determinations.

In its reply to defendant's argument, MPAS contends it is not trying to "second guess" the juvenile court's decisions, nor is it trying to interfere with ongoing probate court jurisdiction or the rights of parents and court appointed counsel. Plaintiff maintains that any action by MPAS would involve only an investigation into a rights violation at a DSS facility. Thus, MPAS activity would not implicate issues which could have been adjudicated by the juvenile court. In light of this fact, the Court agrees with plaintiff that no *res judicata* issue exists.

Finally, defendant points out that federal courts generally abstain from exercising jurisdiction in cases where there are pending state court proceedings. DSS appears to argue that where the juvenile court retains jurisdiction over a minor housed in a DSS facility, state proceedings are "pending." There is simply no support for such an argument in the law. As MPAS notes, there are no pending state court proceedings which are related to this case. Jurisdiction is proper in this Court. Accordingly, the Court concludes that defendant's final objection to plaintiff's motion for summary judgment is without merit.

### CONCLUSION

For the foregoing reasons, the Court concludes that plaintiff's motion for summary judgment shall be granted. By limiting MPAS' access to speaking with minors in DSS facilities only if the minor is a client of MPAS or if there has been a complaint to

MPAS regarding the minor, DSS is in violation of the DD and PAMII Acts.

The issue remains as to the appropriate level of access to which MPAS is entitled under the DD and PAMII Acts. In light of the complicated nature of the issues in this case, the Court has determined that this matter shall be referred to two Special Masters for resolution, pursuant to Fed.R.Civ.P. 53. The parties shall be instructed to confer in good faith and submit to the Court, not later than Friday, April 8, 1994, the names of two individuals who have agreed to serve in that capacity; the compensation they shall receive; the names of the party or parties who shall bear the costs of such compensation; the duties the Special Masters shall fulfill; a timeline for the resolution of this matter by the Special Masters not later than May 6, 1994; and whether the parties stipulate that the findings of the Special Masters shall be final.

An order consistent with this opinion shall issue forthwith.

## ORDER

Pursuant to the memorandum opinion of even date, plaintiff's motion for summary judgment (# 18) is **GRANTED.**

Counsel for both parties are hereby ordered to submit to the Court, not later than **Wednesday, April 6, 1994:**

(1) The names of two individuals who have agreed to serve as Special Masters;

(2) The compensation they shall receive for such service;

(3) The names of the party or parties who shall bear the costs of such compensation;

(4) The duties the Special Masters shall fulfill;

(5) A timeline for the resolution of this matter by the Special Masters not later than **May 6, 1994;**

(6) Whether the parties stipulate that the findings of the Special Masters shall be final

for the purposes of defining the parameters of MPAS access to DSS facilities.

**IT IS SO ORDERED.**