# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-4171

DISABILITY RIGHTS WISCONSIN, INC.,

*Plaintiff-Appellant,*

*v.*

STATE OF WISCONSIN DEPARTMENT
OF PUBLIC INSTRUCTION and
ELIZABETH BURMASTER, State
Superintendent of Public Instruction,
in her official capacity,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 05-C-0295-C—**Barbara B. Crabb**, *Chief Judge.*

ARGUED MAY 2, 2006—DECIDED SEPTEMBER 13, 2006

Before CUDAHY, RIPPLE, and WOOD, *Circuit Judges.*

CUDAHY, *Circuit Judge.* The specific issue in this appeal is whether and to what extent the State of Wisconsin Department of Public Instruction (DPI) must disclose records uncovered in its investigation into the use of "time out" or seclusion rooms for disciplining students at the Abraham Lincoln Elementary School (Lincoln) in Monroe,

Wisconsin, to Disability Rights Wisconsin, Inc. (DRW)[1]—the agency authorized to investigate alleged incidents of abuse or neglect of people with mental or physical disabilities in the state. The broader issue concerns the scope of state protection and advocacy agencies' rights to records when the agencies have reason to believe that the citizens they are charged with protecting are being abused or neglected. DRW brought suit in federal court seeking declaratory and injunctive relief to compel DPI to turn over its records. The district court denied DRW's motion, reasoning that the relevant statutes require DRW to know the names of students who may have been placed in the seclusion rooms or at least try to obtain permission from their legal representatives to access the records. The district court also concluded that DRW failed to show that it had exhausted the available administrative remedies—an issue meriting no further consideration since DPI expressly abandoned it at oral argument. We vacate the judgment and remand the case for further proceedings.

## I.  Background

DRW is a nonprofit stock corporation designated by the state of Wisconsin to serve as its protection and advocacy agency (P&A agency), as required under federal law. WIS. STAT. § 51.62 (2006). Wisconsin trusts that DRW, in this capacity, will protect individuals with disabilities or mental illness and be an advocate on their behalf. The three federal statutes requiring that the states establish P&A agencies and governing their operations are the Developmental Disabilities and Bill of Rights Act (the DD Act), the Protection and Advocacy for Mentally Ill Individuals Act of 1986

---

[1]  DRW was, at the outset of this appeal, known as the Wisconsin Coalition for Advocacy or WCA.

(the PAIMI Act)[2] and the Protection and Advocacy of Individual Rights Act (the PAIR Act)—known collectively as the federal protection and advocacy statutes or the federal P&A statutes. DD Act, 42 U.S.C. §§ 15001-115 (2006); PAIMI Act, 42 U.S.C. § 10801-851 (2006); PAIR Act, 29 U.S.C. § 794e (2006).

The federal P&A statutes, which Congress enacted after concluding that state systems for protecting the rights of individuals with disabilities varied widely and were in many cases inadequate, condition federal funding for each state on the establishment of an effective protection and advocacy system for individuals with mental illness or physical disabilities. 42 U.S.C. §§ 15001, 15041, 15043; 42 U.S.C. §§ 10801(a)(1)-(4), 10803, 10805; 29 U.S.C. §§ 794e(a)(1); 794(e)(f).

Lincoln has two seclusion rooms that it has in the past used as part of its special education program to place students who had become unruly on "time-outs" if their individual education plans (IEPs) allowed it. (R., Jt. Stipulated Findings of Fact ¶¶ 4-5.) The general idea behind seclusion rooms is to remove children from the classroom who are behaving inappropriately to allow them time and space to calm down and regain control of their behavior. (R., Compl., Ex. A.) Staff also have used the room to seclude students presenting dangers to themselves or to others. (R., Compl., Ex. A.)

---

[2] Some courts abbreviate the Protection of Mentally Ill Individuals Act of 1986 to "PAMII." In 1988, Congress amended the statute to remove all references to the phrase "mentally ill individuals" and replaced those references with "individuals with mental illness." *See* Requirements Applicable to Protection and Advocacy of Individuals with Mental Illness, 62 Fed. Reg. 53548-01 (Dep't of Health & Human Servs. Oct. 15, 1997) (final rule). Only the title remained unchanged. We adopt "PAIMI," which the parties and district court chose as well.

In October 2004, the parents of G.M., a student enrolled in Lincoln's special education program, complained to DRW that a staff member had physically restrained and dragged G.M. to a seclusion room on the lower-level of the school.[3] This report was apparently the first report that DRW received regarding the use of seclusion rooms at Lincoln.

The seclusion room at issue in the complaint was approximately five feet by nine feet in size. Dark grey carpeting covered the floor and the walls. Fluorescent ceiling lighting illuminated the room, along with a window in the door. The door to the room had a lock and no interior door knob, which violated the fire code and has since been remedied. (R., Jt. Stipulated Findings of Fact ¶ 7.)

On February 27, 2005, a television station in Madison, Wisconsin, informed DPI that it intended to air a report about a seclusion room in a state school district. The station refused to identify the district to DPI. On March 1, a reporter from the station requested comments from DRW regarding an investigation into the seclusion room at Lincoln. The television report, which aired on March 2,

---

[3] Lincoln has two seclusion rooms that, at the time of the claims, it sometimes used to put unruly children on "time-outs." DPI identified four children who had been placed in the lower-level room during the 2004-2005 school year and two children who had been placed in the main-level room, which is next to the principal's office. DPI concluded that the use of the main-level room was not problematic. As the legality of the seclusion rooms is not at issue in this appeal and since DRW has requested access to DPI's files pertaining to all six children potentially placed in both rooms, we do not differentiate between the rooms in this opinion. In addition, although Lincoln still has the seclusion rooms (so far as we can tell), we refer to them in the past tense in light of the district's moratorium on their use. (R., Jt. Stipulated Findings of Fact ¶¶ 4-5; R., Def.'s Br. and App. in Opp. to Mot. for Prelim. Inj. 10-11.)

2005, showed the seclusion room and included interviews with children who claimed they had been locked inside. The broadcast also featured interviews with those children's parents.

After the broadcast, additional parents who either knew or suspected that their children had been locked in the seclusion room requested help from DRW. Because many of these children are nonverbal or have limited verbal capacities, some parents are unable to determine whether their children were placed in the seclusion room. Also following the broadcast, DPI—the agency charged with, among other things, enforcing compliance with state and federal special education laws in Wisconsin—launched an investigation into Lincoln's use of the seclusion room. DPI concluded that the room violated a number of state and federal laws and revealed that Lincoln staff had placed six children inside. Its report, however, did not identify the children by name.

DRW obtained a copy of DPI's findings on April 11, 2005, and that same day informed DPI that it was conducting its own investigation of the room. DRW also asked DPI to provide a copy of its investigative file (which would include the names of the children) or send a copy of its findings to the parents of the six children who had been placed in the seclusion room during the 2004-2005 school year. DPI eventually sent the file but redacted the children's names and any information that might identify them. DPI explained that it decided to redact the information based on court decisions, state and federal pupil confidentiality laws (including the Individuals with Disabilities Education Improvement Act (IDEA) and the Family Educational Rights and Privacy Act (FERPA)), and preliminary guidance received from the U.S. Department of Education.

DRW eventually filed a motion for a preliminary injunction in the Western District of Wisconsin, seeking release of

the names. The district court converted the motion to a motion for a permanent injunction and gave the parties time to file additional materials. The court eventually denied DRW's request, reasoning that DRW did not show that it had exhausted its administrative remedies or explain why it need not do so, and also that the federal protection and advocacy statutes require DRW to know the names of the individuals whose records it wishes to access or to try to obtain consent for that access from the students' legal representatives. DRW timely appealed, arguing that the federal P&A statutes entitle it to all the information in DPI's files.

## II. Discussion

Resolving this case requires us first to understand how the federal P&A statutes operate and next to determine whether FERPA affects their application in the context of school-related records. We review questions of statutory interpretation de novo. *Gaffney v. Riverboat Servs. of Ind., Inc.*, 451 F.3d 424, 445 (7th Cir. 2006). In the context of a district court's denial of an injunction, we review legal conclusions de novo and findings of fact for clear error. *Joelner v. Village of Wash. Park*, 378 F.3d 613, 619-20 (7th Cir. 2004).

### A.  The Federal P&A Statutes

DPI contends that the federal P&A statutes do not entitle DRW to the information it seeks. DRW contends that it is entitled to the information it seeks even in the absence of authorization from the individuals' guardians. Addressing those arguments requires a close examination of the federal P&A statutes governing the protection and advocacy system.

The core requirement of the federal P&A statutes is that, in order to receive federal funding, each state must establish an effective protection and advocacy system to respond to allegations of abuse and neglect and generally to protect the rights of individuals with disabilities. 42 U.S.C. § 15043(a)(2)(A)(i); 42 U.S.C. § 10805(a)(1); 29 U.S.C. § 794e(f)(3). The DD Act, the PAIMI Act and the PAIR Act establish separate but largely parallel regimes to serve particular populations of people with disabilities. *See* Gary P. Gross, *Protection and Advocacy System Standing—To Vindicate the Rights of Persons With Disabilities*, 22 MENTAL AND PHYSICAL DISABILITY LAW RPTR. 674, 674 (Sept.-Oct. 1998) (providing extensive background on the P&A system).

The DD Act, which Congress enacted in 1975, was the first statute to establish a federally directed P&A system. It, like the later-enacted PAIMI and PAIR Acts, requires that states establish P&A agencies such as DRW, and authorizes those agencies "to pursue legal, administrative, and other appropriate remedies or approaches" to ensure that individuals with disabilities are protected. 42 U.S.C. § 15043(a)(2)(A)(i). The DD Act, however, limits the scope of the P&A agencies' authority to individuals with developmental disabilities. § 15043(a)(1). To qualify for services under the DD Act, an individual must have a severe, chronic disability that became manifest before the age of 22 and that results in substantial functional limits in three or more "major life activities," including self-care, receptive and expressive language, learning, mobility, self-direction, capacity for independent living and economic self-sufficiency. § 15002(8)(A).

The PAIMI Act, which contains many of the same directives as the DD Act, was enacted in 1986 to protect the rights of individuals with mental illness by requiring, as a condition of federal funding, that states establish P&A systems with authority to investigate and remedy suspected

abuse or neglect of individuals with mental illness. 42 U.S.C. § 10805(a)(1). The PAIMI Act initially applied only to individuals with mental illness living in "facilities," which included, among other things, nursing homes, community facilities, board and care homes, homeless shelters and prisons. 45 C.F.R. § 1386.22(e)(1)-(3) (2006). In 2000, Congress amended the PAIMI Act to cover individuals with mental illness living in "community settings," including their own homes. 42 U.S.C. § 10802(4)(B)(ii). To qualify for services under the PAIMI Act, an individual must have a "significant mental illness or emotional impairment, as determined by a mental health professional." § 10802(4). The PAIMI Act, like the DD Act, directs that P&A agencies shall have broad investigatory authority to carry out their responsibility to protect individuals with mental illness and to advocate on their behalf. § 10805(a)(1).

The third statute relating to the state P&A system is the PAIR Act, which Congress enacted in 1994 to serve people with disabilities who were not covered under either the DD Act or the PAIMI Act. 29 U.S.C. § 794e. To receive federal funds under the PAIR Act, a state must establish a P&A system that has "the same general authorities, including access to records and program income, as are set forth [in the DD Act]." § 794e(f)(1)-(2).

Each of the three federal P&A statutes supplies state P&A agencies with broad investigatory authority, including access to certain records. 42 U.S.C. § 15043(a)(2)(H)-(I); 42 U.S.C. § 10805(a); 29 U.S.C. § 794e(f)(2). The statutes specifically authorize P&A agencies such as DRW to investigate incidents of abuse or neglect of individuals when the agencies receive complaints or determine that there is probable cause—that is, reasonable grounds to believe that an individual has been, or may be, subject to abuse or neglect. 42 U.S.C. § 15043(a)(2)(B); 42 U.S.C. § 10805(a)(1)(A); 29 U.S.C. § 794e(f)(2); 45 C.F.R. § 1386.19;

42 C.F.R. § 51.2.[4] The statutes further authorize the P&A agencies to pursue administrative, legal and other appropriate remedies to ensure the protection of individuals with disabilities or mental illness in the state. 42 U.S.C. § 15043(a)(2)(A)(i); 42 U.S.C. § 10805(a)(1); 29 U.S.C. § 794e(f)(3).

In addition to granting general investigative power, the federal P&A statutes also state that the P&A agencies must "have access to all records of any individual" with disabilities or mental illness "who is a client of the system if such individual or legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access." 42 U.S.C. § 15043(a)(2)(I)(i); 42 U.S.C. § 10805(a)(4)(A); 29 U.S.C. § 794e(f)(2). In circumstances where an individual has no parent or guardian, the P&A agencies may access records so long as they have probable cause to believe that abuse has occurred. 42 U.S.C. § 15043(a)(2)(I)(ii); 42 U.S.C. § 10805(a)(4)(B); 29 U.S.C. § 794e(f)(2). Finally, where the individual's guardian has failed or refused to act, the P&A agencies may access records under the DD Act and the PAIR Act so long as they have probable cause to believe that the individual has been subject to abuse or neglect, or, under the PAIMI Act, they have probable cause to believe that an individual's health or safety is in serious and immediate jeopardy. 42 U.S.C. § 15043(a)(2)(I)(iii); 42 U.S.C. § 10805(a)(4)(C); 29 U.S.C. § 794e(f)(2). Thus, in general, the federal P&A statutes require the P&A agencies to obtain a guardian's consent before they may access individual records. Two issues follow

---

[4] The probable cause standard under the PAIMI Act is slightly more rigorous. The relevant regulation defines probable cause to mean: "reasonable grounds for belief that an individual with mental illness has been, or may be *at significant risk of being* subject to abuse or neglect." 42 C.F.R. 51.2 (emphasis added).

from this requirement: (1) whether the records that DRW seeks are "individual records"; and (2) whether something special about the present case alters or eliminates the general consent requirement in these circumstances.

## B. *Records Under the Federal P&A Statutes*

Whether the records that DRW seek fall within the ambit of "individual records" is not an easy issue to resolve; the records are not easily classified. But it is important to examine the definition of the term, since, in ordinary cases, the classification of the documents sought will control the terms of their release.

Records, under the DD Act, include:

> a report prepared or received by any staff at any location at which services, supports, or other assistance is provided to individuals with developmental disabilities; a report prepared by an agency or staff person charged with investigating reports of incidents of abuse or neglect, injury, or death occurring at such location, that describes the incidents and steps taken to investigate; and a discharge planning record.

42 U.S.C. § 15043(c)(1)-(3). The PAIR Act, once again, is parallel to the DD Act. 29 U.S.C. § 794e(f)(2). The PAIMI Act defines records as "reports prepared by any staff of a facility rendering care and treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility that describe incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents, and discharge planning records." 42 U.S.C. § 10806(b)(3)(A).

DPI argued in the district court that the information DRW seeks does not constitute a "record" within the

meaning of the federal P&A statutes because DPI is not a "facility" nor is it charged with investigating abuse or neglect. The fact that DPI is not a "facility" is of no moment; the potential abuse or neglect took place at *Lincoln*, and Lincoln easily meets the definition of a facility. 45 C.F.R. § 1386.19 ("Facility includes any setting that provides care, treatment, services and habilitation . . . ."). The argument that DPI itself is not an agency charged with investigating reports of abuse or neglect is also beside the point. For starters, DPI did in fact investigate complaints of potential abuse or neglect at Lincoln. And in the end, it is up to DRW to determine whether abuse did in fact occur; preventing DRW from obtaining the information it needs to investigate on the basis that DPI did something it was not required to do frustrates the goals of the federal P&A system.

DRW, on the other hand, argues that, while it is seeking records, it need not obtain authorization before it is entitled to the information. DRW, it seems to us, is essentially trying to draw a distinction between investigatory information and individual records. Since, DRW reasons, the federal P&A statutes expressly authorize the P&A agencies to investigate incidents of abuse and neglect if they have probable cause to believe that the abuse occurred, the agencies must also have access to records about that abuse. Although this argument has some intuitive appeal, it fails to address the fact that each federal P&A statute contains provisions pertaining to the release of records that are entirely separate from the provisions supplying the agencies with investigatory authority. And for the most part, the records provisions specifically require that the P&A agencies obtain a guardian's authorization before they may have access to records except where an individual has no guardian or, under the DD Act and the PAIR Act, the agencies have probable cause to believe that abuse or neglect has occurred or, under the PAIMI Act, that abuse is imminent and the guardian has failed to act.

Some textual support for DRW's apparent distinction between investigatory information and individual records seems to come from 42 U.S.C. § 15043(a)(2)(J)(i), which directs that agencies must "have access to the records of individuals described in subparagraphs (B) and (I), and *other records* relevant to conducting an investigation, under the circumstances described in those subparagraphs" (emphasis added). The language relating to "other records" initially seems to support DRW; although the language directly concerns how quickly a P&A agency is entitled to records, it does appear to be broader than the language governing individual records and contains no limiting language. But if "other records" covers the information that DRW seeks here—information about DPI's investigation including the names of the students—then the authorization requirement for individual records seems rather innocuous. If § 15043(a)(2)(J)(i) (quoted above) allows an outside agency to access individual records *without* authorization simply because the records are relevant to an investigation, why have an authorization requirement at all? Will not almost every record that a P&A agency seeks somehow qualify as relevant to an investigation? Construing "other records" in such a manner would, we think, effectively eliminate the authorization requirement altogether.

Aside from this more or less technical point, we also must recognize the context surrounding a request for records. The bulk of the information that DRW seeks (most of which it already possesses) is generalized information about the room where students are confined—its size, its characteristics and the provisions for its use. But once DRW obtains the students' names, it inevitably obtains individualized information about the students—namely, that the students' IEPs call for use of the seclusion room and that the students were subject to discipline involving the room. Especially in light of these inevitable revelations that the release

of the names will provide, we must conclude that the records at issue here are individual records generally subject to the guardians' authorization requirement contained in the federal P&A statutes.

Concluding, however, that the records DRW seeks are individual records does not necessarily preclude the agency from access to at least some of the information. *See Ala. Disabilities Advocacy Prog. v. J.S. Tarwater Dev. Ctr.*, 97 F.3d 492, 497 (11th Cir. 1996) (concluding that "it is clear that the [federal P&A statutes] provide[ ] express authority for P&A's to gain broad access to records, facilities and residents to ensure that the [statutes'] mandates can be effectively pursued"); *Miss. Protection & Advocacy Sys., Inc. v. Cotten*, 929 F.2d 1054, 1058-59 (5th Cir. 1991) (holding that facilities have an affirmative duty to implement policies and practices that promote effective P&A access). DRW repeatedly argues that it is circular to require that it obtain authorization from the students or their representatives so that it may obtain the names of the students. That argument is well taken, for imposing such a requirement essentially means that DRW cannot satisfy the prerequisites for obtaining X without obtaining X itself.[5] In addition to confounding DRW in the present case, requiring the agency to obtain authorization before it can learn the children's names has the potential to run afoul of the federal P&A statutes in some circumstances: without the names of the children or their guardians, DRW cannot assess whether their guardians are taking adequate protective measures if abuse is imminent. That is, without names, DRW could never intervene where guardians are

---

[5] Although DRW could, for example, contact every guardian at Lincoln and inform them of the potential problems, such a requirement would be onerous and not always effective. The universe of potential victims is admittedly small here. But that will not always be the case.

not protecting the individuals—a hazardous circumstance expressly contemplated by the federal P&A statutes.

Here, DRW is not seeking unfocused and unspecific information about possible abuse or neglect at Lincoln. This is instead a situation where, based on news reports, complaints and DPI's investigation, DRW has probable cause to believe that six identifiable children may have been abused or neglected and is now attempting to ascertain whether that abuse did in fact occur. Two of the students potentially placed in the seclusion rooms are DRW's clients. Their parents have authorized DRW to obtain the records. But since DRW does not know who the other four students are, it simply cannot investigate the extent of any abuse or neglect. In addition, if DRW determines that future, serious abuse is imminent, it cannot ascertain whether the threatened students are adequately protected by their guardians.

There is another important aspect of DRW's special function as Wisconsin's designated P&A agency in these unusual circumstances. As we have explained, P&A agencies have a duty to serve individuals with disabilities or mental illness. *See, e.g.*, *Ala. Disabilities Advocacy Prog.*, 97 F.3d at 497, 499. Because of that role, DRW is under an especially significant duty of confidentiality. *See, e.g.*, *Wis. Coalition for Advocacy v. Czaplewski*, 131 F. Supp. 2d 1039, 1059 (E.D. Wis. 2001) (noting that nursing home patients would suffer no privacy harm because "federal law requires that WCA, as the Protection & Advocacy System, keep such records confidential").

Specific provisions of the federal P&A statutes reinforce these conclusions. Both the DD Act and the PAIR Act bar P&A agencies from disclosing information obtained from client records to unauthorized parties. *See* 45 C.F.R. § 1386.22(e)(1)-(3). Although disclosure of the names might not create a client relationship between the guard-

ians and DRW, this technicality would not diminish the need for confidentiality. DRW specializes in the protection of persons with disabilities and mental illness, and confidentiality is a key aspect of protection.

Likewise, the PAIMI Act imposes a specific duty of confidentiality upon the P&A agencies in the context of mental health records obtained from a provider of mental health services. Although the PAIMI Act does not define what constitutes a provider of mental health services, DPI—an administrative agency—would not ordinarily fall within the general understanding of that term. But DPI is responsible for ensuring that the schools, which are charged with the care of all children (including the mentally ill), provide adequate care and in a larger sense is a provider of mental health services.

The district courts, in particular, have been remarkably active and consistent in construing PAIMI's duty of confidentiality. The clear message of these cases is the conclusion that the duty of confidentiality should be deemed to require P&A agencies to maintain the confidentiality of records regardless of their technical classification. *See, e.g.*, *Protection & Advocacy Sys., Inc. v. Freudenthal*, 412 F. Supp. 2d 1211, 1215-16 (D. Wyo. 2006); *State of Conn. Office of Prot. & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 355 F. Supp. 2d 649, 663-64 (D. Conn. 2005); *Advocacy Ctr. v. Stalder*, 128 F. Supp. 2d 358, 366 (M.D. La. 1999); *see also Ala. Disabilities Advocacy Prog.*, 97 F.3d at 497, 499. PAIMI might be one source of the duty of confidentiality, but it is not the only one. The P&A agencies' nature as protectors of individuals with disabilities or mental illness is critical and not to be overlooked. *See Iowa Prot. & Advocacy Servs., Inc. v. Gerard Treatment Programs, LLC*, 152 F. Supp. 2d 1150, 1160-61 (N.D. Iowa 2001) (discussing PAIMI's duty of confidentiality and concluding that a guardian's expressed unwillingness to

authorize a P&A agency to access records does not necessarily preclude that access).

The reasoning underlying these cases is persuasive, and we conclude that DRW is subject to the same strictures of confidentiality as DPI. Since both DRW and DPI must observe similar confidentiality requirements, this case at bottom involves a confidential exchange of information between two agencies—one agency that specializes in protecting individuals with disabilities or mental illness and another more generalist agency charged with administering public education in Wisconsin. Given the duty of confidentiality common to both organizations, DRW's possession of the information seems no more troubling as a privacy matter than DPI's possession.

Lastly, it is important to recognize the alternative to allowing DRW to access the records at issue. DRW has special expertise with respect to persons with mental illness or other disabilities. To withhold the records in contention here is to give the generalist agency (DPI) the last word over matters of abuse and neglect of the disabled or mentally ill. This clearly defeats the purposes of DRW and the federal P&A statutes.

We believe that the district court here gave inadequate weight to the whole of the statutory scheme and undue emphasis to a technical reading of certain statutory elements. *United States v. Misc. Firearms, Explosives, Destructive Devices & Ammunition*, 376 F.3d 709, 712 (7th Cir. 2004) (noting that a fundamental canon of statutory interpretation is that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme). The point of the federal P&A statutes is to establish and equip a specialized agency to look out for individuals with mental illness. Confounding the agency in the name of an illusory concern for privacy defeats that very important goal. Accordingly, we conclude that requiring

DRW to obtain authorization before it can learn the names of the children DPI believes were placed in the seclusion room violates both the spirit and the letter of the federal P&A statutes.

## C. *FERPA's Interaction with the Federal P&A Statutes*

We finally consider whether FERPA operates to prevent DPI from releasing the records it has assembled. FERPA represents a response to what Congress saw as growing evidence of abuse of student records in the United States. *See, e.g.*, *Rios v. Read*, 73 F.R.D. 589, 597-99 (E.D.N.Y. 1977). Of specific concern were incidents of access without informed parental consent, lack of a formal system for governing access by nonschool personnel and failure to disclose disciplinary information to parents. Address to the Legislative Conference of the National Congress of Parents and Teachers, March 12, 1975, 121 Cong. Rec. S7974 (daily ed. May 13, 1975).

Relevant here, FERPA protects personally identifiable information other than directory information from release without parental consent. 20 U.S.C. § 1232g(b)(1)-(2) (2006). Personally identifiable information includes, but is not limited to, the students' names, names of their parents or other family members, the addresses of the students or their family, any personal identifiers such as social security numbers or student numbers, a list of personal characteristics that would make the students' identities easily traceable or any other information that would make the students' identities easily traceable. 20 U.S.C. § 1232g; 34 C.F.R. § 99.3 (2006). Directory information, on the other hand, is a type of personally identifiable information not usually considered harmful if disclosed. It generally includes (but is not limited to) students' names, addresses, telephone numbers, major fields of study and dates of attendance. 34 C.F.R. § 99.3.

Here again, the information that DRW seeks is not easily classified. The students' names would, in ordinary circumstances, fall under the rubric of directory information. But as we explained earlier, the students' names here carry with them information about the students' IEPs and disciplinary records, which ordinarily might implicate FERPA if released to third parties.

This case, however, is not ordinary. As the Eleventh Circuit has recognized, neither students with disabilities nor their parents are harmed when a P&A agency is permitted access to records. *Tarwater*, 97 F.3d at 497-99. On the contrary, the P&A agency's access *facilitates* protection of individuals with mental illness—it is the only way to realize the agency's role as watchdog of the system. Privacy interests, then, are frequently outweighed by DRW's broad mandate to investigate and remedy suspected abuse or neglect. *Ala. Disabilities Advocacy Prog.*, 97 F.3d at 497; *Office of Prot. and Advocacy for Persons with Disabilities v. Armstrong*, 266 F. Supp. 2d 303, 319, 322 (D. Conn. 2003).

We note in closing that the details of release of information are important but difficult to anticipate and deal with. They therefore lie within the discretion of the district court. This case is complex, and although the students' privacy interests do not outweigh DRW's need to access the information, neither should those interests be ignored when they are implicated. In that vein, we recognize that a number of specific release scenarios which would be consistent with this opinion would, we think, satisfy the federal P&A statutes.

### III.  CONCLUSION

Accordingly, we VACATE the judgment of the district court and REMAND for further proceedings consistent with this opinion. Each side shall bear its own costs.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*