**OFFICE OF PROTECTION AND AD-VOCACY FOR PERSONS WITH DISABILITIES, Plaintiff,**

v.

**John J. ARMSTRONG, Defendant.**

**No. 3:01 CV 1118 DJS.**

United States District Court, D. Connecticut.

March 31, 2003.

Gwendolyn K. McDonald, Nancy B. Alisberg, State Of Connecticut, Office Of Prot. & Adv. For Handicapped, Hartford, CT, for Protection & Advocacy for Persons with Disabilities, State of CT, plaintiff.

Terrance M. O'Neill, Attorney General's Office, Hartford, CT, for John J. Armstrong, Comm State of CT Dept of Corr /O, defendant.

## RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

SQUATRITO, District Judge.

The plaintiff brings this action for declaratory and injunctive relief under the Protection and Advocacy for Mentally Ill Individuals Act, 42 U.S.C. §§ 10801–10827 ("PAMII") and 42 U.S.C. § 1983 (" § 1983"). Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331 as this action arises under 42 U.S.C. §§ 10801–10827 and the First and Fourteenth Amendments to the Constitution of the United States. Now pending before

the Court are the parties' cross motions for summary judgment.

## I. FACTS

Examination of the pleadings, Local Rule 9 statements, and supporting materials discloses the following material facts, which, unless otherwise noted, are undisputed.

The plaintiff, State of Connecticut Office of Protection and Advocacy for Persons with Disabilities ("Connecticut P & A"), is a state agency designated by the Governor of the State of Connecticut to provide protection and advocacy services to individuals with disabilities, including persons suffering from mental illness. In its enabling legislation, the Connecticut legislature created Connecticut P & A to further the State's "special responsibility for the care, treatment, education, rehabilitation of and advocacy for its disabled citizens." Conn. Gen.Stat. § 46a–7.

The defendant, John J. Armstrong ("Armstrong"), is sued solely in his official capacity as the Commissioner of the Connecticut Department of Correction ("DOC").

The Connecticut P & A is funded in part by the federal government, pursuant to PAMII. Through PAMII, Connecticut P & A is authorized to investigate incidents of abuse, neglect and civil rights violations, and to pursue administrative, legal and other remedies on behalf of individuals with mental illness wherever programs for such individuals are operated within the State of Connecticut or within the State's control. 42 U.S.C. § 10805; 42 C.F.R. § 51.41(b)(2).

Between approximately August 2000 and April 2001, Connecticut P & A became aware of the suicide deaths of five DOC inmates: K.F., G.K., J.B., K.V., and D.C.[1]

---

1. The parties have been critical of each others' handling of the confidentiality of the

identities of these inmates. While the names have been disclosed in the briefs submitted to

Connecticut P & A's awareness was based solely upon its staff's review of newspaper accounts of the suicides. *Pla's Memo. in Support of Mot. for S.J.* Ex. 1 (copies of these articles). Connecticut P & A similarly became aware of the death of another DOC inmate, B.W., who died while being transported to the inpatient ward of a DOC mental health unit.

Connecticut P & A subsequently determined that it had probable cause to believe that each of these inmates was mentally ill, and that the inmates had been subject to abuse and neglect. Connecticut P & A did not consult with the families of the deceased inmates when it made these determinations. Upon each probable cause determination, Connecticut P & A requested access to the deceased inmates' psychiatric, medical and all other records relating to their deaths. Connecticut P & A did not obtain releases from the next of kin of the eight deceased inmates before requesting their records.

DOC responded to Connecticut P & A's records request by initially informing it that DOC was conducting investigations into the deaths. DOC told Connecticut P & A that it would be contacted at the conclusion of each investigation. Furthermore, DOC requested that Connecticut P & A substantiate the probable cause determination which formed the basis for Connecticut P & A's records request, and asked that Connecticut P & A obtain authorization from the deceased inmates' next of kin. Connecticut P & A declined to do so. It is unclear what records, if any, were ever sent to Connecticut P & A.[2]

On June 18, 2001, Connecticut P & A filed, along with its Complaint, an applica-

tion for preliminary injunction in this Court, seeking the requested records. The motion for preliminary injunction was denied without prejudice on February 15, 2002, as was a subsequent motion to dismiss filed by the defendant.

In the interim, on or about July 31, 2001, Connecticut P & A was provided, for the first time, with a release from the next of kin of one of the deceased inmates, D.C. Connecticut P & A subsequently followed up on its prior record request with DOC. Connecticut P & A claims it never received these records.

In addition, in or about September and October 2001, Connecticut P & A became aware of the deaths of two other DOC inmates, J.B. and B.B., one of whom was being held at DOC's Manson Youth Institute. Connecticut P & A requested these inmates' psychiatric, medical and all other records regarding their deaths. DOC responded in the same way it had responded to Connecticut P & A's other prior record requests. Accordingly, on February 26, 2002, Connecticut P & A amended its Complaint to include these two deceased inmates.

Now pending are the parties' cross motions for summary judgment.

## II. STANDARD OF REVIEW

A motion for summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). Summary judgment is appropriate if, after discovery, the non-

---

the Court—and in the media, for that matter—the Court will use the inmates' initials to preserve their anonymity.

**2.** Armstrong claims that the records of one inmate were turned over to Connecticut P & A Connecticut P & A claims, however, that it has not received any records from DOC.

moving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group, Inc. v. London Am. Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975)). A dispute concerning a material fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

## III. DISCUSSION

The parties have filed cross motions for summary judgment, and appear to be in agreement that there are no disputed facts that would prevent summary judgment as a matter of law. Connecticut P & A argues that Armstrong has violated PAMII by refusing to provide it with records relating to the deaths of eight deceased inmates, and seeks a permanent injunction ordering Armstrong to provide such records. In response, Armstrong argues that Connecticut P & A has failed to meet the statutory and regulatory predicates for obtaining these records, and thus cannot sustain its legal claim of entitlement.

Before examining the parties' respective positions, the Court will provide a brief background of PAMII and the protection and advocacy system ("P & A").

### A. Background of PAMII and P & A

In response to the "inhumane and despicable conditions" discovered at a New York institution for persons with developmental disabilities, Congress enacted the Developmental Disabilities Assistance and Bill of Rights Act of 1975, 42 U.S.C. §§ 6041–6043 ("DDA"), to "protect the human civil rights of this vulnerable population." *Iowa Prot. & Advocacy Servs., Inc. v. Gerard Treatment Programs, L.L.C.,* 152 F.Supp.2d 1150, 1157 (N.D.Iowa 2001) (describing the genesis of DDA). In order to receive federal funds under DDA, a State must have in effect a P & A. 42 U.S.C. § 6042(a)(1).[3] The plaintiff, Connecticut P & A, is Connecticut's protection and advocacy agency.

In 1986, Congress passed the Protection and Advocacy for Mentally Ill Individuals Act ("PAMII"), 42 U.S.C. §§ 10801–10827, as amended, after finding that individuals with mental illness are vulnerable to abuse, neglect and serious injury, and that state systems for monitoring the rights of these individuals vary widely and are frequently inadequate. 42 U.S.C. § 10801(a). Furthermore, Congress found that "family members of individuals with mental illness play a crucial role in being advocates for the rights of individuals with mental illness where the individuals are minors, the individuals are legally competent and choose to involve the family members, and the individuals are legally incompetent and the legal guardians, conservators, or other legal representatives are members of the family." *Id.*

---

**3.** In 2000, the DDA was repealed and replaced in its entirety by the Developmental Disabilities Act of 2000, Pub.L. 106–402, codified at 42 U.S.C. §§ 15001–15115.

PAMII was modeled after DDA, and was intended to "ensure that the rights of individuals with mental illness are protected, and to assist States to establish and operate a[P & A] for individuals with mental illness which will protect and advocate the rights of such individuals." *Id.* §§ 10801(b)(1), 10801(b)(2)(A). PAMII specifically charges the State's P & A, which is an independent agency, with the duty to "investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." *Id.* § 10801(b)(2)(B); *see also id.* § 10805(a)(1). In addition, the State's P & A is authorized to, *inter alia*, "pursue administrative, legal and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State." *Id.* § 10805(a)(1)(B).

In order to carry out these objectives, PAMII provides the State's P & A with the authority to have access to certain records of individuals with mental illness, including "reports prepared by any staff or faculty rendering care and treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents, and discharge planning records." *Id.* § 10806(b)(3)(A); *see also Pennsylvania Prot. & Advocacy, Inc. v. Houstoun*, 228 F.3d 423, 426 n. 1 (3d Cir.2000) (finding that the definition of "records" in § 10806 was applicable to the term in § 10805).

A State P & A may access the records of three classes of individuals with mental illness. 42 U.S.C. § 10805(a)(4). First, it may access the records of any "individual who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access." *Id.* § 10805(a)(4)(A). None of. the inmates at issue in this case were "client[s]" of the Connecticut P & A.

Second, the State's P & A may access those records of any individual with a mental illness who has a legal guardian, conservator or other legal representative, and with respect to whom either (1) a complaint has been made to the P & A, or (2) for whom there is probable cause to believe his health or safety is in serious and immediate jeopardy, if it contacts the legal guardian, conservator or legal representative, offers assistance to that person, but that person fails or refuses to act on behalf of the person with a mental illness. *Id.* § 10805(a)(4)(C). This second class of individuals with mental illness is not at issue in this case.

What is at issue is the third class of individuals with mental illness—which includes those individuals who have died— who:

(i) by reason of the mental or physical condition of such individual is unable to authorize the system to have such access;

(ii) who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and

(iii) with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities (either of which result from a complaint or other evidence) there is probable cause to believe that such individual has been subject to abuse or neglect.

*Id.* § 10805(a)(4)(B).

Any records obtained by the State's P & A pursuant to PAMII are subject to the

same Federal or State confidentiality regulations that are applicable to providers of mental health services. *Id.* § 10806(a).

## B. *Issues on Summary Judgment*

As discussed, the parties have filed cross motions for summary judgment. Connecticut P & A argues that the plain language of PAMII authorizes its access to the records of DOC inmates with mental illness, and seeks declaratory and injunctive relief to direct Armstrong to provide it with such records. Connecticut P & A also claims that its rights pursuant to the First and Fourteenth Amendments have been violated by Armstrong pursuant to § 1983 because Armstrong is preventing it from performing its functions under PAMII on behalf of individuals with mental illness who are currently incarcerated at DOC facilities.

Armstrong argues that Connecticut P & A has failed to establish several requirements of PAMII, including the following: (1) that the eight inmates discussed in its Complaint with one exception [4]—are "individuals with mental illness" pursuant to PAMII; (2) that DOC prisons and jails constitute "facilities," as that term is used in PAMII; (3) that P & A has consent from the families of the deceased inmates to obtain these records, or attempted to obtain such consent; and (4) that Connecticut P & A has "probable cause" to believe the eight inmates suffered from abuse or neglect. Finally, Armstrong argues that P & A lacks standing to bring a claim against it pursuant to § 1983 for alleged violations of the First and Fourteenth Amendments.

■ In order to obtain the permanent injunction it seeks, Connecticut P & A must show "the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *N.Y. State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir.1989). Furthermore, Connecticut P & A must actually succeed on the merits of its claim and cannot rest, as it may when seeking a preliminary injunction, on a mere showing of a likelihood of success. *Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

■ In this case, there can be no dispute that Connecticut P & A has no other adequate remedy at law, and that it will be irreparably harmed if it is "prevented from pursuing fully its right to access records ... in pursuit of its duty to investigate circumstances providing probable cause to believe abuse or neglect may be occurring." *Iowa Prot. & Advocacy Services, Inc. v. Rasmussen,* 206 F.R.D. 630, 635 (S.D.Iowa 2001) (quoting *Gerard Treatment Programs, L.L.C.,* 152 F.Supp.2d at 1173); *see also Wisconsin Coalition for Advocacy, Inc. v. Czaplewski,* 131 F.Supp.2d 1039, 1051 (E.D.Wis.2001); *Advocacy Ctr. v. Stalder,* 128 F.Supp.2d 358 (M.D.La.1999).

With that resolved, the key issue before the Court is whether Connecticut P & A can show actual success on the merits of its claim. In this regard, the Court will address Connecticut P & A's authority under PAMII, in light of each of the alleged statutory deficiencies cited by the defendant.

### 1. PAMII and § 1983

The plain language of PAMII provides Connecticut P & A with the independent authority to pursue legal remedies to ensure the protection of individuals with

---

4. Armstrong claims that there is only factual support for the mental illness of one inmate, whose records it claims were sent to Connect-

icut P & A. Connecticut P & A denies it received any such records.

mental illness. 42 U.S.C. § 10805(a)(1)(B). This authority alone has provided similar P & As with the standing to bring actions for declaratory or injunctive relief in a judicial forum, and courts have awarded such relief simply on the basis of PAMII's language. *See, e.g., Kentucky Prot. & Advocacy Div. v. Hall, et al.,* No. 3:01cv–538–H, slip. op. (W.D.Ky. Sept. 24, 2001).

In this case, however, Connecticut P & A has pursued its relief, at least in part, through § 1983. Section 1983 provides relief for persons who, under color of state law, have been deprived of any rights, privileges or immunities secured by the U.S. Constitution. Connecticut P & A argues that Armstrong, acting under color of state law, failed to comply with PAMII, a federal statute, and thus violated § 1983. It also argues that Armstrong's refusal to supply it with records violates its rights under the First and Fourteenth Amendments.

It is not unheard of for a P & A to pursue declaratory or injunctive relief through § 1983. In fact, several courts that have considered a P & A's claim to enforce its authority under PAMII have done so through § 1983. For example, in *Advocacy Center v. Stalder,* a court found that a P & A's allegations raised "questions regarding constitutional violations by the defendant." 128 F.Supp.2d at 365. Specifically, the court found that a P & A had a First Amendment right to "communicate and consult with the population it was created to serve," and that "timely access to records is essential for effective communication between the [P & A] and its clients just as it is for other advocates and attorneys." *Id.* The court concluded that any denial of access certainly occurred while the defendant was acting under color of state law, and thus found § 1983 an appropriate avenue to find relief. *Id.* at 366.

In this case, the same rationale seems appropriate. Furthermore, as the court in *Stalder* pointed out, § 1983 provides a cause of action for violations of federal statutes, unless Congress has "foreclosed" such an enforcement action, or where the federal statute "does not create enforceable rights, privileges or immunities within the meaning of § 1983." *Id.* (internal citations omitted). The *Stalder* court rightly noted that PAMII contains no express statement or comprehensive remedial scheme foreclosing a § 1983 action. *Id.* Instead, it cited PAMII's express language to the contrary. *Id.*

Armstrong argues, however, that Connecticut P & A may not sustain an action under § 1983 for several technical reasons. First, Armstrong argues that Connecticut P & A does not have standing to bring a § 1983 action, since it doesn't make sense for a State agency to sue another member of the State. None of the courts which have considered a P & A's claim under § 1983 have questioned its standing to bring such a claim. Indeed, this seems logical, since while the P & A is a State agency, it has a representative function, and thus is entrusted with protecting the civil rights of individuals with mental illness. *See, e.g.,* 42 U.S.C. § 10805.

In addition, Armstrong argues that Connecticut P & A has failed to exhaust its administrative remedies. There are two relevant exhaustion requirements at issue: that under § 1983 and that in PAMII. In regards to § 1983, Connecticut P & A has rightly cited the case of *Patsy v. Board of Regents of State of Florida,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), for the proposition that such exhaustion is generally not required under § 1983. The only exception to this rule may be where a party has asserted a procedural due pro-

cess claim. *See, e.g., Russo v. City of Hartford,* 184 F.Supp.2d 169, 180 (D.Conn. 2002) (citing *Narumanchi v. Bd. of Trustees of Conn. State Univ.,* 850 F.2d 70, 72 (2d Cir.1988)). No such claim has been asserted here.

PAMII itself also has an exhaustion requirement, in that the right of a P & A to pursue such an action is provided after the P & A has exhausted all available administrative remedies, "where appropriate." 42 U.S.C. § 10807. PAMII indicates, however, that "[i]f, in pursuing administrative remedies, the [P & A] determines that any matter with respect to such individual will not be resolved within a reasonable time, the [P & A] may pursue alternative remedies, including the initiation of a legal action." *Id.* Armstrong has not pointed to any specific administrative remedies that have not been exhausted by Connecticut P & A. Indeed, there is evidence to suggest that Connecticut P & A attempted to request the pertinent records of DOC, and Armstrong declined to provide them. Connecticut P & A denies that it is required to take any of the other administrative steps Armstrong might suggest, including obtaining consent or articulating probable cause. Indeed, whether it is required to do so is the crux of this action for relief. In any event, the Court deems the actions taken by Connecticut P & A adequate to satisfy the exhaustion requirement. Other courts have reached a similar conclusion. *See, e.g., Stalder,* 128 F.Supp.2d at 365; *see also Alabama Disabilities Advocacy Prog. v. J.S. Tarwater*

*Development Ctr.,* 894 F.Supp. 424 (M.D.Ala.), *aff'd,* 97 F.3d 492 (11th Cir. 1996).

■ Finally, Armstrong argues that he is entitled to Eleventh Amendment immunity on the § 1983 claim. There is an exception to Eleventh Amendment immunity where a party seeks only prospective injunctive relief. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Since Connecticut P & A seeks this very type of relief, the Court finds that such immunity is not in order.

Of course, even if Connecticut P & A's § 1983 claim was defective in some way, the Court has already noted that there is ample case law to support the power of a P & A to pursue its claims in a judicial forum simply under PAMII.

With these preliminary issues disposed of, the Court will now consider whether Connecticut P & A can actually succeed on the merits of its claims:

**2. Individual with a mental illness**

■ PAMII gives Connecticut P & A authority to investigate the abuse and neglect of individuals with mental illness. 42 U.S.C. §§ 10801(b)(2)(B), 10805(a)(1). Armstrong first argues that Connecticut P & A cannot establish the most basic of prerequisites for establishing its entitlement to the authority of PAMII—that the eight inmates in question fit the definition of "individuals with a mental illness."[5] Armstrong cites PAMII's statutory lan-

---

5. Individual with a mental illness is defined as an individual: "(A) who has a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the State; and (B)(I)(I) who is an inpatient or resident in a facility rendering care or treatment, even if the whereabouts of such inpatient or resident are unknown; (II) who is in the process of being admitted to a facility rendering care or treatment, including persons being transported to such a facility; or (III) who is involuntarily confined in a municipal detention facility for reasons other than serving a sentence resulting from conviction for a criminal offense; or (B)(ii) who satisfies the requirements of subparagraph (A) and lives in a community setting, including their own home." 42 U.S.C. § 10802(4).

guage, which suggests that whether an individual meets this definition is to be "determined by a mental health professional qualified under the laws and regulations of the State," not the local P & A. *Id.* § 10802(4).

Connecticut P & A claims that while it is "not required to do so," it can meet the standards set forth in various other federal cases for establishing the qualification of these eight inmates—and others similarly situated—for PAMII's protections. Furthermore, Connecticut P & A argues that it would be unreasonable to require it to meet the standard suggested by Armstrong—to allege "well-pleaded facts" of mental illness—without access to the requested records.

 The Court disagrees with Armstrong's suggestion that Connecticut P & A must make a threshold showing of mental illness for DOC inmates before it can gain access to their records. As a number of courts that have considered this issue have concluded, "evidence that a facility has previously housed individuals who are mentally ill, as well as evidence that some current residents may be mentally ill is sufficient under PAMII to merit access by [P & As]." *Hall,* No. 3:01cv–538–H, slip. op. at 3 (citing *Michigan Prot. & Advocacy Serv., Inc. v. Miller,* 849 F.Supp. 1202, 1207 (W.D.Mich.1994) (concerning training schools, detention facilities and foster care homes)).

Armstrong argues that the cases that have adopted this rationale have limited impact on the facts of this case, because these other cases dealt with facilities whose express purpose was to treat and/or rehabilitate mental illness. Armstrong argues that in these type of cases, it is far easier for a court to make the leap that an individual housed in the facility must be an "individual with mental illness." While the Court appreciates Armstrong's logic, it finds that the value of these cases and their rationale is not diminished by the distinction cited by Armstrong.

Indeed, in applying this rationale of these cases to the facts before the Court, it seems obvious to the Court that DOC has housed individuals, both currently and in the past, who are mentally ill. Even if this fact were not self-evident, Connecticut P & A has cited various studies that discuss the prevalence of the mentally ill in prison populations. *See, e.g.,* Allen J. Beck and Laura M. Maruschak, *Mental Health Treatment in State Prisons, 2000,* NCJ 188215, at 6 (July 2001) (reporting that nearly 18% of Connecticut State prisoners received therapy or counseling, and that one in every eight State prisoners nationwide receive some mental health therapy or counseling services); H. Richard Lamb and Linda E. Weinberger, *Persons with Several Mental Illness in Jails and Prisons: A Review,* 9 Jail Suicide/Mental Health Update 10, 11 (1999) (stating that "clinical reports suggest that 10 to 15 percent of persons in state prisons have several mental illness[es]"); Fred Cohen, *The Mentally Disordered Inmate and the Law* 1.7–1.8 (1998).

Furthermore, Connecticut P & A points out that even if an individualized assessment of each inmate was necessary—a requirement that the Court does not impose today—the fact that seven of these eight inmates committed suicide certainly suggests that each suffered from some sort of mental illness or condition.[6] *See generally* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*

---

**6.** The eighth inmate died while being transported to the inpatient ward of a DOC mental health unit.

(4th Ed.2000). In fact, DOC's own regulations designate a prisoner who is actively suicidal with a mental health classification of MH5, which demands a "suicide watch of frequency of 15 minutes or less to one-on-one monitoring and observation." *Connecticut Dep't of Corr. Objective Classification Manual* at 28 (found at *Pla's Memo. in Support of Mot. for S.J.* Ex. 3). Moreover, under DOC directives "[a]n inmate assessed as suicidal shall be promptly transferred to an infirmary," and prolonged suicidal tendencies may require a transfer to a licensed inpatient facility. *Connecticut Dep't of Corr. Admin. Directives Revision Form 8.14, Suicide Prevention* at 6–7 (also found at *Pla's Memo. in Support of Mot. for S.J.* Ex. 3). Connecticut P & A suggests that in light of these directives, Armstrong's argument that these seven inmates were not mentally ill is against the policy objectives of PAMII: "[i]t is unreasonable to believe that a prisoner who attempts suicide and fails is mentally ill [under DOC regulations], but a prisoner who succeeds is not." The Court agrees.

Finally, a contrary conclusion would seem counter to Congress' intent to have State facilities and records accessible to the local P & A in order to investigate suspected abuse or neglect of the mentally ill. Moreover, it seems obvious that Connecticut P & A's ability to do as Armstrong asks—make an affirmative showing that each inmate is mentally ill—is severely hampered by Armstrong's own refusal to provide these inmates' basic psychiatric and mental health records. *Miller*, 849 F.Supp. at 1207 (finding that "[the defendant's] present policy of denying [P & A] full access prevents the advocacy organization from bringing in their own mental health professionals to ascertain whether any DSS residents do in fact suffer from mental illness ... [and] defeats the very purpose of PAMII ... to provide effective

protection and advocacy services to mentally ill ... individuals"); *Georgia Advocacy Office v. Borison*, 238 Ga.App. 780, 520 S.E.2d 701, 704 (1999) ("[w]ithout access to the records, [P & A] could not specifically show which, if any study participant[s] ... were mentally ill"). As another court considering this issue has stated, "[d]emanding a conclusive, individualized showing of ... mental illness before permitting [access] would reserve to Defendant a gatekeeping function contrary to the specific terms and general purpose of the Acts." *Hall*, No. 3:01cv–538–H, slip. op. at 4.

For all these reasons, the Court finds that Connecticut P & A is entitled to exercise PAMII's authority in DOC facilities.

### 3. "Facility" under PAMII

Armstrong also suggests that Connecticut P & A has not met the statutory requirements of PAMII because DOC is not a "facility" pursuant to PAMII. PAMII states that a facility "may include, but need not be limited to, hospitals, nursing homes, community facilities for individuals with mental illness, board and care homes, homeless shelters, and jails and prisons." 42 U.S.C. § 10802(3). Armstrong puts great weight on the phrase "may include" in PAMII's definition of facility, and suggests that based on this permissive language, the definition of facility need not include "jails and prisons" like DOC.

In support of this interpretation of PAMII, Armstrong suggests that the majority of PAMII cases concern facilities that are distinct from DOC, in that their very purpose is to treat individuals with mental illness. Armstrong argues that since DOC serves a general population, it should not be considered the type of a facility that is automatically subject to PAMII, a statute related exclusively to individuals with mental illness. Finally, Armstrong suggests

that even if jails and prisons are considered facilities under PAMII, P & As should only have access to those inmates who are housed in mental health units, as opposed to the entirety of the general population.

Connecticut P & A argues that its right to access inmates in the general population of jails and prisons is quite clear. It rejects the limitation Armstrong wishes to put on the plain language of PAMII, which includes "jails and prisons" among the facilities that may be subject to its authority.

The Court agrees with Connecticut P & A that the language in PAMII is far from ambiguous. While Armstrong is correct that PAMII says only that facilities may include jails and prisons, he offers no basis for the Court to extract any intention on the part of Congress not to include the general population of facilities like DOC. Connecticut P & A has in fact offered evidence that Congress did intend to include the general population of jails and prisons, even though the explicit language of PAMII fails to specify as such. For example, regulations promulgated under PAMII by the Department of Health and Human Services ("HHS") expand the definition of facility to include "jails and prisons, including all general areas as well as special mental health or forensic units." 42 C.F.R. § 51.2.[7] While the definition of facility in this regulation may be broader than the language in PAMII, it nevertheless sheds light on how HHS interpreted Congress' intent in relationship to the impact of PAMII on general populations in jails and prisons. In fact, HHS reiterated this belief when it stated that it "concur[red] that a [P & A] may assist prisoners or detainees with mental illness who are maintained within the general prison

of jail populations and who may receive mental health services from time to time as well as those who are maintained in special mental health units." 62 Fed.Reg. 53552 (Oct. 15, 1997).

This result is consistent with conclusions other courts have drawn that various types of facilities not specifically designated for individuals with mental illness still fall within the scope of PAMII. For example, in *Michigan Protection & Advocacy Service, Inc. v. Miller*, the court found that PAMII applied to youth training schools and detention centers operated by the Michigan Department of Social Services. 849 F.Supp. at 1207. The defendant in *Miller* pursued a similar argument as Armstrong, but the court found that the plain language of PAMII supported a different view. The court concluded that "[t]he simple fact that DSS facilities are primarily concerned with education and rehabilitation does not prevent them from falling under the auspices of PAMII." *Id.* The court reasoned that Congress could not have intended such a limited definition of facility, especially when its own statutory definition contemplated the inclusion of homeless shelters and jails, facilities whose main purpose was not the treatment of mental illness. *Id.; see also Stalder*, 128 F.Supp.2d at 358 (allowing P & A to have access to records of prisoners incarcerated at the David Wade Correctional Center).

Finally, on a policy basis, such a restriction would unreasonably limit the purposefully broad access given to P & As in PAMII to redress the suffering of mentally ill individuals. As Connecticut P & A points out, a requirement that an inmate be housed in the mental health unit of a DOC facility in order to invoke PAMII's

---

7. Congress provided HHS with authority to promulgate final regulations to carry out PA-

MII. Amending Act, § 9.

protections would overlook too many members of the class sought to be protected, since only those prisoners with the most serious mental illness are housed in such a unit. *See, e.g., Connecticut DOC Objective Classification Manual* (found at *Pla's Memo in Support of Mot. for S.J.* Ex. 3).

For all these reasons, the Court finds that DOC is a "facility" subject to the authority vested in Connecticut P & A pursuant to PAMII.

### 4. P & A access to records of individuals with mental illness

The thorniest issue between the parties is whether Connecticut P & A is entitled to access the records of individuals with mental illness such as the eight deceased DOC inmates. As discussed earlier, PAMII entitles Connecticut P & A to access the records of certain classes of individuals with mental illness, including those who have died, who:

(i) by reason of the mental or physical condition of such individual is unable to authorize the system to have such access;

(ii) who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and

(iii) with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities (either of which result from a complaint or other evidence) there is probable cause to believe that such individual has been subject to abuse or neglect.

42 U.S.C. § 10805(a)(4)(B).

There can be no dispute that the first element is met, since "by reason of [their] ... physical condition," the deceased inmates in question are "unable to authorize the [P & A] to have such access." *Id.* § 10805(a)(4)(B)(i); *see also, e.g., J.S. Tarwater*, 97 F.3d at 497 n. 2. Armstrong argues that Connecticut P & A has failed to show that it satisfies the latter two elements, however. Specifically, Armstrong argues that Connecticut P & A has not shown that each of the eight inmates discussed has no "legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State." *Id.* § 10805(a)(4)(B)(ii).

Furthermore, Armstrong argues that Connecticut P & A's failure to seek and obtain the consent of the deceased's next of kin before requesting records is contrary to Connecticut statute. Conn. Gen. Stat. § 52–146s. Finally, Armstrong argues that Connecticut P & A has failed to establish that "there is probable cause to believe that these individuals have been subject to abuse or neglect," 42 U.S.C. § 10805(a)(4)(C), and thus Connecticut P & A is not entitled to access these inmates' DOC records under PAMII.

Connecticut P & A argues that the plain language of PAMII entitles them to such access, and that its records requests are free of the deficiencies cited by Armstrong. Furthermore, it argues that to the extent any Connecticut statute cited by Armstrong limits its access to such records, that statute is preempted by PAMII.

The Court will now consider these issues:

### a. *Role of legal guardians, conservators, legal representatives, and next of kin*

In order for Connecticut P & A to access the records of each deceased inmate under PAMII, he must "not have a legal guardian, conservator, or other legal representative." 42 U.S.C. § 10805(a)(4)(B)(ii). Armstrong argues that Connecticut P & A has failed to make

an affirmative showing that none of these eight inmates have such a person to protect his legal interests. Connecticut P & A suggests that they need not make this showing, and that even if an inmate had such a representative, Connecticut law suggests that his representative capacity would extinguish at the time of the inmates' death.

Some cases considering this issue have placed the burden to show the presence of a legal guardian, conservator or legal representative on the facility blocking a P & A's access. Where the defendant facility has not made such a showing, courts have ordered it to provide the P & A with the names of individuals' guardians, conservators or legal representatives, if any. *See, e.g., Cramer v. Chiles*, No. 98–43–MISC–T–26A, slip op. (M.D.Fla. Sept. 1, 1998). This is consistent with the PAMII regulations promulgated by HHS, particularly § 51.43 which states:

Denial of delay or access.

If a P & A system's access to facilities, programs, residents or records covered by the Act or this part is delayed or denied, the P & A system shall be provided promptly with a written statement of reasons, *including, in the case of a denial for alleged lack of authorization, the name, address and telephone number of the legal guardian, conservator, or other legal representative of an individual with mental illness.* Access to facilities, records or residents shall not be delayed or denied without the prompt provision of written statements of the reasons for the denial.

42 C.F.R. § 51.43 (emphasis added). In this case, there is no suggestion that Armstrong has made such a disclosure to Connecticut P & A, nor has Armstrong affirmatively stated that any of the eight inmates involved had such a legal guardian, conservator or legal representative.

Moreover, it is clear under Connecticut law that the deceased inmates in question could not have had a conservator or legal guardian. For example, in Connecticut, a conservator may be appointed when an individual with a mental, emotional or physical condition is unable to care for him or herself, Conn. Gen.Stat. § 45a–644(b) and (c), but courts have found that if the individual dies, the conservatorship automatically terminates. *Zanoni v. Hudon*, 42 Conn.App. 70, 77, 678 A.2d 12 (1996) (citing *Kleinman v. Marshall*, 192 Conn. 479, 483, 472 A.2d 772 (1984)). Furthermore, according to Connecticut statute, a guardian is only appointed for those adults who are mentally retarded. Conn. Gen. Stat. § 45a–669 *et seq.* Other courts considering this issue have relied on similar statutory provisions. *Advocacy Inc. v. Tarrant County Hosp. Dist.*, 2001 WL 1297688, at *3 (N.D.Tex. Oct. 11, 2001) (relying on Tex. Probate Code Ann. §§ 694(b)(1) & 745(a)(2) to find that there was no "evidence or law to suggest that a legal guardian, conservator, or other legal representative exists to act for [the decedent's] interests posthumously"); *J.S. Tarwater Developmental Center*, 97 F.3d at 497 (finding that under Alabama statute, guardianship terminated upon the death of the ward).

■ Furthermore, according to Connecticut statute, a "legal representative" is defined as "any court appointed fiduciary, including, but not limited to, a guardian, conservator, executor or administrator." Conn. Gen.Stat. § 45a–557a(8). Therefore, absent the disclosure of such a court-appointed person by Armstrong, family members or relatives without such court authority are not considered "legal representatives." *See, e.g., J.S. Tarwater*, 97 F.3d at 497 ("[t]he statutory preference in favor of a relative cannot be elevated into

an automatic grant of the powers of an administrator").

The Court notes, as well, that excluding family members who are not "legal guardians, conservators or legal representatives" from this portion of the statute is not inconsistent with PAMII. Indeed, the portion of PAMII that refers to the importance of family role states: "family members of individuals with mental illness play a crucial role in being advocates for the rights of individuals with mental illness where ... the individuals are legally incompetent and the legal guardians, conservators, or other legal representatives are members of the family." 42 U.S.C. § 10801(a). In *J.S. Tarwater*, the court reasoned that providing the P & A such access did not diminish PAMII's goal to recognize the important role of family.

Furthermore, the court emphasized that P & A's access did not stop the parents from obtaining their children's medical records if they wished, nor did it affect their entitlement to such records. *Id.* at 498. The court also reminded the parties that the P & A had a duty to keep such records confidential. 45 C.F.R. § 1386.21(b).

■ Of course, where facilities like DOC notify the P & A that a guardian, conservator or legal representative has been appointed pursuant to 42 C.F.R. § 51.43, another provision of PAMII is invoked. 42 U.S.C. § 10805(a)(4)(B)(iii). Pursuant to this section, the P & A should contact the guardian, conservator or representative. *Id.* § 10805(a)(4)(C)(i)-(iii). If this person fails or refuses to act on behalf of the individual with mental illness, however, the P & A has the authority to access records. *Id.* § 10805(a)(4)(C). This failure to act includes the situation where a guardian, conservator or legal representative doesn't give consent for such access. *Gerard Treatment*, 152 F.Supp.2d at 1167

(extending rationale applied to DDA in *Disability Law Ctr. v. Riel*, 130 F.Supp.2d 294, 300-01 (D.Mass.2001)). Courts have held that "[e]ven if there were a legal guardian applicable to the present action, the advocacy agency's statutory mandate to investigate abuse and neglect may trump any objections that the legal guardian has concerning access to the pertinent records." *Tarrant*, 2001 WL 1297688, *3 n. 5 (citing *Gerard Treatment Programs*, 152 F.Supp.2d at 1162-63).

■ Armstrong also argues, however, that even if Connecticut P & A satisfies this part of PAMII, providing it with access without obtaining a release from the inmates' next of kin is contrary to Connecticut statute. Connecticut P & A argues in response that any contrary Connecticut statute is preempted by PAMII.

Under Connecticut statute, a "professional counselor shall not disclose [communications relating to the diagnosis and treatment of a person between such person and a professional counselor or between a member of such person's family and a professional counselor] unless the person or the authorized representative of such person consents to waive the privilege and allow such disclosure." Conn. Gen.Stat. § 52-146s(b). The statute provides limited exceptions to this rule, none of which have been invoked. *Id.* § 52-146s(c). Furthermore, the State statutory scheme enacting PAMII states that Connecticut P & A may request records "with the consent of such person with a disability, or the parent or guardian of such person, as appropriate." *Id.* § 46a-11(5).

■ The PAMII is quite clear, however, that a P & A's authority to seek records as provided in that Act preempts any State law to the contrary by virtue of the Supremacy Clause of the United States Constitution:

If the laws of a State prohibit an eligible system from obtaining access to the records of individuals with mental illness ... [the section providing authority to access records] shall not apply to such system before the earlier of the date such system is no longer subject to such a prohibition, or May 23, 1988.

42 U.S.C. § 10806(b)(2)(C); *see also* 42 C.F.R. § 51.31(i) ("State law must not diminish the required authority of the Act"). Thus, after May 23, 1988, the section will apply regardless of the laws of the State. *Rasmussen*, 206 F.R.D. 630, 638–39. Numerous courts have upheld this concept of express preemption in similar circumstances. *See, e.g., Rasmussen*, 206 F.R.D. 630, 638–39; *Czaplewski*, 131 F.Supp.2d at 1048–49; *Houstoun*, 228 F.3d at 428 (involving confidentiality of peer review records); *Stalder*, 128 F.Supp.2d at 366 (involving access to prison records); *Washington Prot. & Advocacy Sys., Inc. v. State of Washington*, No. C98–5401 RJB, slip op. (W.D.Wash. July 26, 1999) (concerning third-party consent); *Oklahoma Disability Law Ctr., Inc. v. Dillon Family & Youth Servs., Inc.*, 879 F.Supp. 1110, 1111–12 (N.D.Okla.1995) (regarding psychiatric records);.

Furthermore, the concern expressed by many State statutes, including Connecticut's—the confidentiality of patient records—is already addressed by PAMII. 42 U.S.C. § 10806(a) (the P & A must main-

tain the confidentiality of its records to the same extent as any provider of services); 42 C.F.R. § 51.45 (same); *see also Arizona Ctr. for Disability Law v. Allen*, 197 F.R.D. 689, 692 (D.Ariz.2000).

For all of these reasons, the Court finds that Connecticut P & A need not obtain the consent of any next of kin for deceased inmates.

**b. *Probable cause***

 Finally, Connecticut P & A must show that "there is probable cause to believe that such individual has been subject to abuse or neglect" [8] in order to access records. 42 U.S.C. § 10805(a)(4)(B)(iii). While "probable cause" is not defined in PAMII, the regulations promulgated therefrom define probable cause as:

> the reasonable grounds for belief that an individual with mental illness has been, or may be at significant risk of being subject to abuse or neglect. The individual making such determination may base the decision on reasonable inferences drawn from his or her experience or training regarding similar incidents, conditions or problems that are usually associated with abuse or neglect.

42 C.F.R. § 51.2. Armstrong argues that Connecticut P & A has failed to affirmatively show that there is "probable cause" of abuse or neglect. Originally, Armstrong replied to Connecticut P & A's rec-

---

**8.** Abuse is defined as "any act or failure to act by an employee of a facility rendering care or treatment which was performed, or which was failed to be performed, knowingly, recklessly, or intentionally, and which caused, or may have caused, injury or death to a[n] individual with mental illness ...." 42 U.S.C. § 10802(1).

Neglect is defined as a "negligent act ·or omission by any individual responsible for providing services in a facility rendering care or treatment which caused or may have caused injury or death to a[n] individual with

mental illness or which placed a[n] individual with mental illness at risk of injury or death, and includes an act or omission such as the failure to establish or carry out an appropriate individual program plan or treatment plan for a[n] individual with mental illness, the failure to provide adequate nutrition, clothing, or health care to a[n] individual with mental illness, or the failure to provide a safe environment for a[n] individual with mental illness, including the failure to maintain adequate numbers of appropriately trained staff." *Id.* § 10802(5).

ord request by saying that DOC would refrain from providing records at least until an internal investigation had been conducted. In addition, Armstrong challenged the probable cause determination reached by Connecticut P & A on behalf of each inmate. Connecticut P & A argued that they should not have to wait for the records, and that it did not need to justify its probable cause determination to Armstrong.

The Court agrees with Connecticut P & A that Armstrong's requests were unreasonable and contrary to PAMII. First, it is clear that the P & A need not rely on any other agency in order to make its probable cause determination. As one court suggested, "a determination of probable cause made by the [P & A] will not be reevaluated by the state or service provider merely because the state or service provider disagrees that probable cause exists." *Center For Legal Advocacy v. Earnest,* 188 F.Supp.2d 1251, 1257 (D.Colo. 2002), *rev'd on other grounds,* 320 F.3d 1107 (10th Cir.2003). In *Iowa Prot. & Advocacy Services, Inc. v. Rasmussen,* the court found that "the statute provides clear authority to Iowa P & A to have access to records of an investigation regardless of the agency's internal findings of neglect or abuse." 206 F.R.D. 630. Instead, the court found that the P & A's determination of probable cause was dependent on its own monitoring, and not those of other state agencies. *Id.*

Furthermore, it is by now a settled principle that the P & A is the "final arbiter of probable cause for the purpose of triggering its authority to access all records for an individual that may have been subject to abuse or neglect." *Arizona Ctr. for Disability Law v. Allen,* 197 F.R.D. 689, 693 (D.Ariz.2000). Such a position has been overwhelmingly agreed with by other courts. *See, e.g., Earnest,*

188 F.Supp.2d at 1257; *Rasmussen,* 206 F.R.D. 630; *Gerard Treatment Programs, L.L.C.,* 152 F.Supp.2d at 1159; *J.S. Tarwater Developmental Ctr.,* 894 F.Supp. at 428–29; *Mt. Washington Pediatric Hospital, Inc.,* 106 Md.App. 55, 664 A.2d 16.

Furthermore, courts have limited similar attempts to question the probable cause determination made by a P & A. For example, courts have rejected attempts to require judicial review of the P & A's probable cause determination. *Mt. Washington Pediatric Hospital, Inc.,* 106 Md. App. 55, 664 A.2d 16 (citing *Mississippi Prot. & Advocacy System, Inc. v. Cotten,* 929 F.2d 1054 (5th Cir.1991)). In *Maryland Disability Law Center v. Mount Washington Pediatric Hospital, Inc.,* the court found that "[t]he initial determination of probable cause to undertake an investigation must be made by the [P & A]," and that the "requirement that the [P & A] convince the circuit court that probable cause exists prior to having access to patients, personnel, and records is burdensome and unnecessary." *Id.* at 24. The court emphasized that the P & A must have "sufficient means of access" in order to fulfill the role it had been entrusted with. *Id.* at 25. Similarly, a regulation that gave a third-party the authority to settle a dispute between a P & A and a facility over probable cause has also been rejected by one court. *Robbins v. Budke,* 739 F.Supp. 1479, 1482 (D.N.M.1990).

Finally, there is a policy basis for supporting the independence of P & As in establishing probable cause. For example, in *J.S. Tarwater,* the Eleventh Circuit discussed probable cause, and offered an apt assessment of the competing interests at work:

[W]e note that unlike criminal law probable cause, the consequence of a P & A's determination of probable cause is not an indictment or an accusation, but rath-

er a civil investigation.... In the P & A probable cause process, the interests of three parties are implicated—those of the facility, those of the individual who may have been subject to abuse and his or her family, and those of the P & A, which has an obligation and mandate to protect from abuse the individual(s) and others who are similarly situated. In this balance, the facility's interests surely are less viable and of less import than ... the P & A ... Indeed one would suppose that a facility's legitimate interests are served when abuse and neglect are uncovered and ... corrected. Likewise, when a P & A makes a finding of probable cause, no liberty interest of the [mentally ill] person is threatened, as it is precisely that individual's interest that the P & A seeks to protect.

97 F.3d at 498–99.

In sum, Armstrong is not in any position to question the probable cause determination of the P & A. Indeed, PAMII makes clear that the P & A is intended to be "independent of any agency in the State which provides treatment or services ... to individuals with mental illness." 42 U.S.C. § 10805(a)(2). As the court said in *Allen,* "to conclude otherwise would frustrate the purpose of the P & A laws to establish an effective system to protect and advocate for the rights of individuals with disabilities." 197 F.R.D. at 693. The court went on to say, "without access to records, a P & A system is unable to accomplish its congressional mandate to investigate incidents of abuse and neglect when the P & A has probable cause to believe that such incidents have occurred." *Id.*

 For all these reasons, the Court finds that Connecticut P & A need not offer any further justification for its probable cause determination. As this is the last issue considered by the Court, it now finds that Connecticut P & A has shown actual success on the merits under PAMII, such that a permanent injunction should issue.

## IV. CONCLUSION

 For the foregoing reasons, plaintiff Connecticut P & A's motion for summary judgment [**doc. # 34**] is **GRANTED**, and defendant Armstrong's motion for summary judgment [**doc. # 37**] is **DE-NIED**. The Court declares that defendant's failure to grant plaintiff access to the records of the eight inmates in question and other similarly situated inmates at DOC facilities violates plaintiff's rights under 42 U.S.C. § 10805(a) and 42 U.S.C. § 1983.

The defendant shall be ENJOINED and RESTRAINED from declining to give timely access to the records of the eight inmates in question, and other similarly situated inmates at DOC facilities when properly requested by the plaintiff for any purpose related to PAMII, consistent with the parameters discussed in this opinion.

The clerk is ordered to close this case.